FILED

2015 NOV -3 PM 3:40

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY_____

1  Ross E. Shanberg, Esq. (SBN 179842)
2  rshanberg@ssbfirm.com
   Shane C. Stafford, Esq. (SBN 216151)
3  sstafford@ssbfirm.com
4  SHANBERG STAFFORD & BARTZ LLP
   19200 Von Karman Avenue, Suite 400
5  Irvine, CA 92612-8512
6  Telephone: (949) 622-5444
   Facsimile: (949) 622-5448
7
8  Shauna B. Itri, Esq.
   sitri@bm.net
9  BERGER & MONTAGUE, P.C.
10 1622 Locust Street
   Philadelphia, PA 19103
11 Telephone: (215) 875-3000
12 Facsimile:  (215) 875-4604

13 Attorneys for Plaintiffs

14          UNITED STATES DISTRICT COURT

15          CENTRAL DISTRICT OF CALIFORNIA

16 UNITED STATES OF                )  CIVIL ACTION NO. : 8:15-cv-1796 AG (JCGx)
17 AMERICA *ex rel.* John Doe,     )
                                   )
18          Plaintiffs,            )
                                   )
19                                 )      FILED UNDER SEAL
          v.                       )
20                                 )   DO NOT PLACE ON PACER
21 COVIDIEN PLC and EV3, INC.,     )
                                   )
22          Defendants.            )   RELATOR'S COMPLAINT
                                   )   PURSUANT TO
23                                 )   THE FEDERAL FALSE CLAIMS
                                   )   ACT, 31 U.S.C. §§ 3729 *ET SEQ.*
24                                 )
25                                 )
                                   )   JURY TRIAL DEMANDED
26                                 )
27                                 )

28

_____
      U.S. et al, ex rel DOE v. COVIDIEN PLC and EV3, INC.

## RELATOR'S COMPLAINT PURSUANT TO

## THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *ET SEQ.*

1.      The relator, John Doe ("Relator"), on behalf of the United States of America, brings this action against defendants, Covidien plc, and ev3, Inc., for violations of the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, to recover all damages, civil penalties and all other recoveries provided for under the FCA.

### I.   THE PARTIES

2.      Covidien plc ("Covidien"), a public limited company organized under the laws of Ireland, is a global leader in the development, manufacture and sale of healthcare products for use in clinical and home settings and had net sales for its fiscal year ended September 26, 2014 of $10.659 billion.  In June 2010, Covidien purchased ev3, Inc. ("ev3"), a vascular device maker for approximately $2.6 billion.  At that time, ev3 became a subsidiary of Covidien. On January 26, 2015, pursuant to a transaction agreement, dated as of June 15, 2014, Medtronic plc completed the acquisition of Covidien in a cash and stock transaction valued at approximately $50 billion.  In connection with the transaction, Medtronic, Inc., a Minnesota corporation (Medtronic, Inc.), and Covidien were combined under, and became subsidiaries of, Medtronic plc. ("Medtronic").   Covidien and ev3 will be referred to collectively herein as "Defendants."

3.     The United States is a plaintiff to this action.   The United States brings this action on behalf of the Department of Health and Human Services ("HHS"), the Center for Medicare and Medicaid Services ("CMS"), and Medicare.

4.     Relator witnessed firsthand the conduct alleged herein. Relator has standing to bring this action pursuant to 31 U.S.C. §3730(b)(1).

5.     Relator's complaint is not based on any other prior public disclosures of the allegations or transactions discussed herein in a criminal, civil, or administrative hearing, lawsuit or investigation or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media.

## II.   SUMMARY OF THE CASE

6.     This *qui tam* case brought against Defendants relates to Defendants' mechanical thrombectomy device, the "Solitaire."

7.     The first mechanical thrombectomy device, the Merci, was cleared by the FDA in 2004.  Since that time, other device manufacturers have sought to enter the market by seeking FDA approval for their "new and improved" devices through the 510(k) clearance process.

8.     Seeing an opportunity to increase cash flow, Defendants decided to enter the mechanical thrombectomy market, by developing the "Solitaire" device.  Defendant conducted a clinical trial, (the "SWIFT" trial) and obtained

510(k) clearance from the FDA to market the Solitaire in March 2012. As detailed herein, the Solitaire, consistent with other mechanical thrombectomy devices, is a device that is intended to restore blood flow and retrieve a clot in patients experiencing acute ischemic stroke. The Solitaire is a "second-line" treatment, *i.e.*, it is only indicated for use when the patient was contraindicated for intravenous treatment (known as "IV-tPA," the only FDA approved stroke treatment), or the IV-tPA was not effective.

9.      Unknown to the FDA, the SWIFT trial was poorly run and caused faulty and deficient data to be submitted to the FDA to support Defendants' 510(k) application.   Through the submission of misleading data and information, Defendants fraudulently induced the FDA to approve the Solitaire device. Thus, any claims for reimbursement are false claims.

10.      After Defendants' fraudulently induced FDA approval for the Solitaire, they began ferociously marketing the device by illegally providing kickbacks to induce hospitals and physicians to use the Solitaire. The kickbacks took several forms, including payments to hospitals to swap out competitors' devices for the Solitaire, and payments in the form of consulting fees, committee participation, and participation in sham trials. All of these methods were designed to funnel remuneration to physicians and hospitals to induce use of the Solitaire.

11.     Defendants compounded their kickback scheme by fraudulently promoting the Solitaire device as a "stroke treatment," despite the FDA's continuous admonition that the device could not be marketed as a "stroke treatment," and CMS's determination that mechanical thrombectomy devices used as a stroke treatment were not reimbursable.

12.     Defendants' conduct did not stop there.  In August 2012, months after the Solitaire was cleared by the FDA for marketing, Defendants' initiated the SWIFT PRIME trial in an effort to grab a greater percentage of the mechanical thrombectomy market share.

13.     The official purpose of the SWIFT PRIME trial was to obtain approval from the FDA to market the Solitaire as a "stroke treatment."

14.     However, as explained herein, Defendants' SWIFT PRIME trial was a ruse.  Defendants' used the SWIFT PRIME trial as yet another illegal method to funnel payments to physicians and hospitals to induce them to use the Solitaire.

15.     In addition to being a sham study, the SWIFT PRIME trial was fraught with many of the same issues that Defendants encountered and failed to fix in the SWIFT trial.  These issues caused patient harm and in extreme circumstances, death.

16.     By these actions, Defendants submitted and have caused the submission of false claims to the government and have made, used, or caused

to make false records or statements, to get false or fraudulent claims to be paid by the government in violation of the FCA.

17.     Relator seeks to recover damages and civil penalties in the name of the United States for the violations alleged herein. On information and belief, the damages and civil penalties that may be assessed against the Defendant under the facts alleged in this Complaint amount to hundreds of millions of dollars.

### III.  JURISDICTION AND VENUE

18.     Jurisdiction is founded upon the Federal False Claims Act,        31 U.S.C. § 3729 *et seq.*, specifically 31 U.S.C. § 3732(a) and (b), and also 28 U.S.C. §§ 1331, 1345.

19.     Personal jurisdiction and venue are proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), Defendant has or had an agent or agents, has or had contacts, and transacts or transacted business and their affairs in this judicial district.

### IV.  THE FALSE CLAIMS ACT

20.     The Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States

for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

21.     The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii).  Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

22.     The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Governments behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

23.     "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

## V.   MEDICARE

24.      Medicare is a government health insurance program for people age 65 or older, some disabled people under 65, and people of all ages with End Stage Renal Disease. 42 U.S.C. §§ 426, 426A.

25.      Medicare is organized into four parts. Part A pays for inpatient hospital stays, skilled nursing facility stays, home health visits (also under Part B), and hospice care. Part B covers physician visits, outpatient services, preventive services, and home health visits. Part C is known as the Medicare Advantage program through which beneficiaries can enroll in a private health, such as a health maintenance organization (HMO), and receive all Medicare-covered benefits. Part D is the voluntary, subsidized outpatient prescription drug benefit.

26.      Medicare is administered by the CMS which is part of the Department of Health and Human Services.   However, most of the daily administration and operation of the Medicare program is managed through contracts with private insurance companies that operate as Fiscal Intermediaries. Fiscal Intermediaries accept and pay reimbursement claims under Medicare Part A and some claims under Part B. Acceptance and payment of claims under Medicare Part B are completed through "Medicare Carriers."

## A.   Medicare Reimbursement to Hospitals

27.     The payment hospitals receive through Medicare for covered services vary depending on the setting (*e.g.,* inpatient or outpatient) where the services were performed. Inpatient services performed by hospitals are generally reimbursed on a "per case" basis. Thus, each inpatient hospitalization is assigned a Diagnosis Related Group ("DRG") based on the nature and severity of the patient's diagnosis and the services performed. The predetermined reimbursement rate based on the DRG is then paid by Medicare. The DRG reimbursement rate is paid to the hospital regardless of the duration of patient stay or the number of services provided.

28.     A process called "grouping" assigns DRGs. A software program known as a "grouper" reviews various data related to the hospitalization such as the patient's diagnosis and the procedures performed to determine the appropriate DRG for the treatment.

29.     In most cases, the services and procedures performed by a hospital serve as the most important data indicator affecting the DRG grouper's decision. These service and procedures are classified and reported using International Classification of Diseases, Ninth Revision, Clinical Modification ("ICD-9-CM") system, established by CMS and the National Center for Health Statistics. This coding system is also known as the "ICD-9 procedure codes."

**B.    Medicare Reimbursement to Physicians**

30.      Services that are provided by a physician in the course of inpatient or outpatient hospital services are billed separately. Thus, they are not billed through DRG or APC payment.

31.      Physicians are reimbursed by Medicare and other insurers through billing codes provided under the Healthcare Common Procedure Coding System (HCPCS) and the Current Procedural Terminology (CPT). As with payments made under DRG and APC for hospital services, the purpose of the billing codes is to bundle similar types of procedures that consume similar amounts of resources.

32.      A methodology called Resource Based Relative Value Scale (RBRVS) is used for determining physician payment values for Medicare. Each procedure code is given a point value known as a Relative Value Unit (RVU) which is then multiplied by a conversion factor set by Congress resulting in a payment rate for each code.

33.      The RBRVS system works in conjunction with the HCPCS which is a standardized coding system that is divided into two principal subsystems, referred to as level I and level II of the HCPCS. These are designed to ensure that Medicare and other health insurance programs process claims in an orderly and consistent manner.

34.    Current Procedural Terminology (CPT) constitutes Level I of the HCPCS. The CPT is a numeric coding system that is maintained annually by the American Medical Association (AMA). CPTs consist of descriptive terms and identifying codes that are used primarily to identify medical services and procedures furnished by physicians and other health care professionals. CPT Codes are standardized and used by providers to consistently identify services and procedures for which they bill public and private health insurance programs.

35.    CPT Codes are divided into three categories of codes. Category I codes consist of five numbers and are the most prevalent as they represent procedures that are consistent with contemporary medical practice and are widely performed and frequently reimbursable.

36.    Category II codes consist of four digits followed by the alpha character "F." These are supplemental tracking codes which are used for submitting and evaluating performance measurements.

37.    Category III codes are used to track new and emerging technologies. Category III codes allow for data collection and utilization tracking for new procedures or services. Category III codes differ from Category I codes in that they are not performed widely by health care professionals, do not have FDA approval, and the service/procedure does not a long track record of proven clinical efficacy. These codes are assigned if there

is ongoing or planned research. The codes consist of four digits followed by the letter "T" and sometimes referred to as "T-Codes." Category III codes are temporary and if the procedure or service is not accepted as a Category I code within five years, the temporary code will retire altogether. If a Category III code is available it must be used instead of any "unlisted" Category I codes.

38.     Unlisted codes consist of five digits with the latter two ending in '99.' When a procedure or service is given an unlisted code by the service provider they must provide additional information that details the procedure performed so that the carrier may determine the appropriate reimbursement. The assignment of the code may be correct only after additional documentation is submitted for the service and reviewed by the carrier. On this form, the physician must certify that the services were "medically indicated and necessary to the health of the patient."

39.     According to the American Medical Association's Instructions for use of the CPT Code book, providers must "select the name of the procedure or service that accurately identifies the service performed." Furthermore, they must "not select a CPT Code that merely approximates the service provided. If no such procedure or service exists, then [they are to] report the service using the appropriate unlisted procedure or service code."

**C. Medicare Only Reimburses for Procedures and Devices that are "Reasonable and Necessary"**

40.     No payment will be made under Medicare if the services rendered are not reasonable and medically necessary. 42 U.S.C. § 1395y(a)(l)(A). Services provided by providers to beneficiaries must "be provided economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-(a)(l).

41.     Services related to a non-covered device are, similarly, not covered by Medicare. 42 C.F.R. § 405.207 ("payment is not made for medical and hospital services that are related to the use of a device that is not covered because CMS determines that the device is not 'reasonable' and 'necessary' . . . or because it is excluded from coverage for other reasons").

42.     Medicare's manuals expressly exclude from coverage a medical device that requires, but has not obtained, premarket approval from FDA because the device is investigational and not established to be reasonable and necessary. Medicare's long-standing policy, which is binding on its fiscal intermediaries, excludes coverage for devices and related services that have not been authorized for marketing by FDA, in accordance with FDA's requirements.

43.     In addition, providers seeking reimbursement from Medicare for a medically required service must not make false statements or

misrepresentations of material fact concerning requests for payment under Medicare, 42 U.S.C. § 1320a-7b(a)(1)(2), § 1320a-7, and 42 C.P.R. § 1001.101(a)(l). If a provider finds or becomes aware of an error or a material omission in claims submitted to Medicare, they must disclose these omissions and/or errors to the Government. 42 U.S.C § 1320-a-7b(a)(3).

## VI.   THE REGULATION OF MEDICAL DEVICES

44.     The federal government, through the Food and Drug Administration ("FDA"), endeavors to ensure the safety and efficacy of medical devices used daily by millions of Americans through a combination of approvals, inspections, enforcement, and self-regulation by device manufacturers. In doing so, the FDA administers the Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 *et seq.*

45.     Congress later enacted the Medical Device Amendments of 1976, 21 U.S.C. § 360c *et seq.* ("MDA"), to supplement the FDCA and to "provide for the safety and effectiveness of medical devices intended for human uses." Pub. L. No. 94-295, 9 Stat. 539, 53(1976)(preamble).   The MDA conferred greater authority on the FDA to regulate medical devices and to prevent devices lacking evidence of safety and effectiveness from being marketed in the United States.

46.     The Center for Devices and Radiological Health ("CDRH") is the FDA regulatory office which has the responsibility to protect the health and

safety of American consumers by ensuring that medical devices designed for use in the human body are safe and effective for their intended uses and are accurately labeled.

47.    A medical device is defined as "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is . . . (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals. . . ." 21 U.S.C. § 321(h).

## A. Classes of Medical Devices

48.    Pursuant to its authority under the MDA, the FDA established three risk-based classifications for medical devices.  Classes I, II, and III represent low, moderate, and high-risk categories based on the intended use of the device.

49.    Class I devices, such as bandages, are considered relatively safe and thus are the least regulated.  Such devices are subject to basic controls, *e.g.*, good manufacturing processes, which the FDA finds "sufficient to provide a reasonable assurance of safety and effectiveness." 42 C.F.R. § 405.201(b).

50.    Class II devices, such as thermometers, powered wheelchairs, and blood pressure cuffs, pose a moderate risk to patients and thus require special

controls to provide reasonable assurance of safety and effectiveness.  42 C.F.R.
§ 405.201(b).

51.    Class III devices are those for which general and/or specific controls are not sufficient to provide reasonable assurance of safe and effective use.  Such devices generally include life-supporting and life-sustaining devices which present a high risk of injury or illness to the patient, such as pacemakers, heart valves, and coronary stents.  42 C.F.R. § 405.201(b).

**B.    Medical Device FDA Approval Process**

52.    The FDCA requires that medical devices be "approved" or "cleared" by FDA prior to their introduction into interstate commerce, otherwise the device is deemed adulterated and/or misbranded. Medical devices which are not substantially equivalent to an already approved device require pre-market approval ("PMA") from the FDA). 21 U.S.C. § 515 Medical devices which are "substantially equivalent" to a device which is already on the market (can be approved by the FDA under a so-called "510(k) notification". 21 U.S.C. §§ 510(k), 513(i). Below is a diagram illustrating the regulatory routes to market medical devices:



1.    Pre-Market Approval Process

53.    PMA is the most stringent level of device regulation required by FDA. The PMA process requires a manufacturer to furnish detailed information about the device's clinical testing, design, manufacturing, packaging, and labeling sufficient to reasonably assure the FDA that the device is safe and effective. 21 C.F.R. §§ 814 & 860.7 *et seq.* The PMA process is designed "[t]o ensure the disapproval of PMA's for devices that have not been shown to be safe and effective or that do not otherwise meet the statutory criteria for approval." 21 C.F.R. § 814.2.[1]

---

[1] In order to conduct such a clinical trial, the manufacturer must receive an investigational device exemption ("IDE"), which allows the manufacturer to legally ship the device for the purposes of

54.     PMA is an expensive and lengthy multi-step process that makes considerable demands on the resources of the manufacturer.   Below is an illustration visually setting forth the PMA process, followed by a description of the steps involved:



<u>First Step:</u> The manufacturer's first step, before the start of any testing of the device in patients, is the submission of an Investigational Device Exemption ("IDE") application, which includes results from nonclinical testing and a statement by the manufacturer that the testing complies with Good Laboratory Practices ("GLP") regulations, discussed in detail in the next section of the Complaint. The device can be tested in patients only if the FDA approves the IDE application. (Under GLP regulations, manufacturers are permitted to submit nonclinical safety data generated in studies that did not comply with the GLP regulations, but in that case they must provide a written justification. If FDA determines that the justification is unacceptable, a manufacturer will be required to repeat the testing and provide data obtained in studies conducted according to GLP regulations.

conducting the trial on human test subjects (*in vivo*).   21 U.S.C.  § 306j(g); 42 C.F.R. § 405.201(b).



**Second Step:**      Before beginning a clinical trial of a significant risk device, the device manufacturer is required to obtain the FDA's approval of the IDE, and a multi-disciplinary group of professionals with backgrounds in areas like science, medicine and bioethics called an Institutional Review Board ("IRB") is required to approve the investigational plan and informed consent form, so that the clinical trial is properly monitored and the human subjects are properly protected. The requirements of an IDE to permit clinical trials, and an IRB to oversee clinical trials, combined with the expense of planning and carrying out clinical trials, mean that obtaining pre-market approval from the FDA for a significant risk device often is a long and expensive process.

**Third Step:**      Upon the completion of clinical testing, the manufacturer submits a PMA application, which usually includes large volumes of data generated by the clinical testing. This includes, among other things, results of nonclinical laboratory studies.  Information on nonclinical laboratory safety studies must include a statement that each study was conducted in compliance with 21 C.F.R. § 58, Good Laboratory Practice for Nonclinical Laboratory Studies. If the study was not conducted in compliance with these regulations, the manufacturer must provide a statement of the reason for the noncompliance.[2]

**Fourth Step:**      The FDA may convene an Advisory Panel composed of experts to evaluate the data submitted in the PMA application. Panel meetings are open to the public.

---

[2] *See* FDA website at:
http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/PremarketApprovalPMA/ucm050289.htm.

<u>Fifth Step:</u>        If the FDA approves the PMA, the device can then be marketed.

55.    Manufacturers may submit a supplemental PMA that requests a modification in components, materials, design, specification, software, color additives, or labeling to a previously approved device.  In most cases, for such modifications, only new preclinical testing is needed to demonstrate reasonable assurance of safety and effectiveness of the modified device.    In these instances, GLP data may be the sole source of safety information used to obtain FDA approval for a manufacturer to modify the device design; a clinical trial may not be needed.    Therefore, the GLP study data are the sole mechanism by which the safety of the device modification is demonstrated.

2.      <u>510(k) Notification Clearance Process</u>

56.    To obtain FDA approval through the 510(k) process, the manufacturer simply files a document making the argument, sometimes with relatively little data to back it up, that the new device is "substantially equivalent" to a marketed device previously approved by the FDA (the "predicate device"). If the FDA, after reviewing the notification form, accepts the manufacturer's claim of substantial equivalence, it clears the device for marketing, usually within the 90-day limit set by regulation, and sometimes much more quickly. A direct study in clinical trials of a device's safety is not required, so the 510(k) mechanism allows devices to be cleared for marketing

with little or no direct evidence of safety and efficacy.[3] Below is a schematic of the 510(k) decision-making process:



## C.   FDA Regulations Regarding the Medical Device Approval/Clearance Process

57.    As described in detail herein, the first stage is the discovery of the device.  The second "non-clinical" stage involves non-clinical (*i.e.*, animal) testing.  The third stage, the "clinical" stage, is where the device is tested in human subjects.  The diagram below succinctly illustrates this process:

---

[3] Food and Drug Administration, Center for Devices and Radiological Health, "Premarket Notification 510(k)."
http://www.fda.gov/cdrh/devadvice/314.html (Downloaded February 4, 2009).



1.     <u>The Good Laboratory Practices Regulations</u>

58.    The Good Laboratory Practice ("GLP") regulations are designed to ensure the safety of drugs and medical devices in the early stages of the FDA approval process—***before the drugs or devices are first tested in patients.***[4] Per the approval process diagram above, the GLP regulations primarily apply to studies within the second "non-clinical" stage.

59.    The concept behind the regulations is a common-sense one: when a medical device is implanted in patients for the first time, the device should already have been shown to be as safe as reasonably possible, based on previous studies in animals or through other laboratory procedures. For example, the metal or plastic in a device should be shown to be nontoxic in animals before that device is implanted in humans in the first clinical trials. Or a device containing wires that will be subjected to repeated bending and other stresses when implanted in a patient (such as the lead wires of cardiac defibrillators) should be subjected to tests that simulate the *in vivo* bending and stresses—tests that allow for a good margin of safety if and when the device is

_____

[4] 21 C.F.R. §58 *et seq.*

later implanted in humans. If a new medical device has features that make it unsafe, these may be detected by GLP-compliant testing at a very early stage of FDA review and then corrected before any patients are put at risk. Not only the initial clinical testing but the post-marketing use of a device in patients may be safer because the device, in the earliest stages of its development, had been put through nonclinical tests that comply with the GLP regulations.

60.    The GLP regulations impose specific requirements for nonclinical safety testing with which manufacturers' or contracted testing facilities must comply for each drug or device.

61.    These GLP requirements are intended to ensure circumstances that affect the quality or integrity of nonclinical safety study data are minimized, and if these circumstances arise during study conduct their impact is clearly described and discussed in the final study report presented to the FDA. Therefore, the FDA can determine the validity of the conclusion of a product's preclinical safety when deciding whether or not a new drug or medical device is safe enough to be tested in patients recruited into the first clinical trials or to be marketed after clinical trials have been conducted.

62.    Failures to abide by GLP regulations have extreme consequences. For devices in the PMA approval process, or devices with features that are distinctive and previously untested together in a single device, the failure to

enforce the GLP regulation can have serious and potentially deadly consequences.

2.   Good Clinical Practice Regulations

63.   Good clinical practice ("GCP") is an international ethical and scientific quality standard for trials involving human subjects, *i.e.,* clinical trials. The FDA has collaborated and adopted International GCP guidance for the conduct of clinical trials, which have been in effect since the 1970s. The many functions covered by GCP include trial design, definition of scientifically and ethically sound trial objectives, oversight of trial activities, data collection and quality assurance, study analysis, and human subject protections. *See* 21 C.F.R. §§ 11, 50, 56, 58, 312, 812.

**VII.   THE ANTI-KICKBACK STATUTE**

64.   The federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), ("AKS") arose out of congressional concern that remuneration provided to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or harmful to a vulnerable patient population. To protect the integrity of the Medicare from these harms, Congress enacted a prohibition against the payment of kickbacks in any form. First enacted in 1972, Congress

strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach.[5]

65.     The AKS prohibits any person or entity from offering, making, soliciting, or accepting remuneration, in cash or in kind, directly or indirectly, to induce or reward any person for purchasing, ordering, or recommending or arranging for the purchasing or ordering of federally-funded medical goods or services:

(i)   Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--

(a)  in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
(b)  in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(ii)  Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--

(a)  to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

---

[5] *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

(b) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. §§ 1320a-7b(b).   Violation of the statute can also subject the perpetrator to exclusion form participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose. 42 U.S.C. §§ 1320a-7(b)(7) and 42 U.S.C. §§ 1320a-7a(a)(7).

66.     Congress has long viewed the elimination of kickbacks as central to any efforts to combat Medicare fraud and abuse. *See United States v. Greber*, 760 F.2d 68, 70-71 (3d. Cir. 1985). Because kickback schemes negatively affect the integrity of federal health care programs, the United States has a strong interest in ensuring the continued viability of False Claims Act actions to deter and redress health care fraud predicated upon kickbacks. *United States ex rel. Charles Wilkins and Daryl Willis v. United Health Group, Inc. et al.*, (3d Cir. Oct. 2010)(No. 10-2747) (Brief for the United States as Amicus Curie Supporting Appellant)("Amicus Brief").

67.     To protect against the erosion of patient care and patient safety, courts uniformly agree that compliance with the AKS is a material condition of payment under Medicare.[6]

68.     These and other courts have held that a person or entity who violates the and causes another to submit claims to the government has violated the False Claims Act regardless of what form the claim or statement takes.  Many of these courts have reasoned that the claims are false, and thus violate the FCA, because there is a false certification – either express or implied – as to compliance with the AKS each time a claim is submitted.[7]

---

[6] *See United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 243 (3d Cir. 2004); *United States ex rel. Roberts v. Aging Care Home Health*, 2007 U.S. Dist. LEXIS 92864, *11 (W.D. La. Dec. 17, 2007); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F.Supp.2d 1017, 1042 (S.D. Tex. 1998); *United States ex rel. Conner v. Salina Regional Health Ctr.*, 543 F.3d 1211, 1223 n.8 (10th Cir. 2008); *United States ex rel. McNutt v. Haleyville Medical Supplies*, 423 F.3d 1256, 1259-1260 (11th Cir. 2005); and *United States v. Rogan*, 459 F. Supp. 2d 692, 717 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008).

[7] *See, e.g., United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008); *United States ex rel. Roberts*, 2007 U.S. Dist. LEXIS 92864, *11 (holding defendants both presented a false or fraudulent claim for payment and relied on a false or fraudulent statement or record to obtain payment from Medicare once Defendants obtained payment from Medicare for services "performed under a prohibited referral).   *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir.1997*); United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 245 (3d Cir. 2004); *Mason v. Medline Industries, Inc.*, 2010 WL 653542, at *5-9 (N.D. Ill. Feb. 18, 2010); *United States v. ex rel. Jamison v. McKesson Corp.*, 2009 WL 3176168 (N.D. Miss. September 29, 2009); *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 12, 17-18 (D. Mass. 2007); *United States ex rel. Bidani v. Lewis*, 264 F. Supp. 2d 612, 615-16; *United States ex rel. Franklin v. Parke-Davis*, 2003 WL 20048255 (D. Mass. August 22, 2003); *United States ex rel. Pogue v. Diabetes Treatment Centers of America*, 238 F. Supp. 2d 258, 264 (D.D.C. 2002); and *United States ex rel. Bartlett v. Tyrone Hospital, Inc.*, 234 F.R.D. 113, 121 (W.D. Pa. 2001).

---

**U.S. et al, ex rel DOE v. COVIDIEN PLC and EV3, INC.**

69.     Moreover, the AKS was recently amended to expressly state what these courts had already held, namely, that a violation of the AKS constitutes a "false or fraudulent" claim under the FCA.  42 U.S.C. § 1320(a)-7b(g).

**VIII.   CERTIFICATIONS TO GOVERNMENT HEALTHCARE PROGRAMS WHEN SUBMITTING CLAIMS FOR REIMBURSEMENT OF MEDICAL DEVICES**

70.     As part of a provider's participation in Medicare, the provider must fill out an enrollment application. For example, the Medicare application for hospitals requires an "authorized official" to be "granted the legal authority to enroll it [the organization] in the Medicare program. . . and to commit the organization to fully abide by the statutes, regulations, and program instructions of the Medicare program."[8] Among the conditions, the provider, through its authorized official attests, "I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to the Federal anti-kickback statute). . . ."[9]

71.     Additionally, a provider seeking reimbursement has contractual obligations to: (1) bill Medicare for only reasonable and necessary medical services (42 U.S.C. §1395y(a)(1)(A)) and not make false statements or misrepresentations of material facts concerning requests for payments under

---

[8] *See* CMS Form 855a.
[9] *Id.*

Medicare (42 U.S.C. §§1320a-7b(a)(1(2), 1320a-7, 1320a-7a, 42 C.F.R. §1395(a)(2)(B).

72.    Once enrolled, many providers seek reimbursement from the federal program for services rendered using individual CMS-1450 forms. The certification on Form CMS-1450 requires the provider to certify "that the billing information as shown on the face hereof is true, accurate and complete" and that "the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts.[10] Each time a hospital submits a claim using the CMS-1450 form, it expressly certifies to those two conditions.

73.    At the end of each fiscal year, hospitals also submit a Medicare cost report, which reconciles claims and certain costs.[11] Annual Medicare cost reports contain an additional, backward-looking express certification of compliance. The certification states:

I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.[12]

[10] *See* Form CMS-1450.
[11] 42 U.S.C. § 1395gl; 42 C.F.R. §413.20(b); *see also* CMS Form 2252-96.
[12] CMS Form 2552-96.

74.    Based on provider certifications, courts have held that certain hospital claims that were associated with violations of laws and regulations could give rise to FCA liability, because the hospital was impliedly attesting that "the claim and the underlying transaction comply[] with such laws, regulations, and program instructions."[13]

### IX.    STROKE TREATMENT AND MECHANICAL THROMBECTOMY

**A.    Ischemic Stroke and Treatment (Intravenous Therapy or IV-tPA)**

75.    A stroke occurs when a vessel in the brain ruptures or is blocked by a blood clot. Stroke medical treatments work to either open the blockage or treat the rupture. An "ischemic stroke" occurs as a result of an obstruction within a blood vessel supplying blood to the brain. It accounts for 87 percent of all stroke cases. A "hemorrhagic stroke" occurs when a weakened blood vessel ruptures and spills blood into brain tissue.

76.    The _**only**_ FDA approved treatment for ischemic strokes is tissue plasminogen activator (tPA, also known as IV-tPA, given through an IV in the arm). IV-tPA works by dissolving the clot and improving blood flow to the part of the brain being deprived of blood flow. If administered within 3 hours

---

[13] CMS Form 855a; *see United States ex rel. Augustine v. Century Health Services Inc.*, 289 F.3d 409, 411 (6th Cir. 2002); *U.S. ex rel. Pogue v. Am. Healthcorp, Inc.*, 914 F. Supp. 1507, 1508 (M.D. Tenn. 1996).

(and up to 4.5 hours in certain eligible patients), IV-tPA improves the chances of recovering from a stroke.

77.     More specifically, when a patient presents with signs/symptoms suggestive of an acute ischemic stroke, the attending physicians order certain imaging tests:

a)   The universal test ordered is a non-contrast CT of the head ("NCCT"), which allows physicians to quickly rule out an intracranial hemorrhage (a contraindication for IV-tPA) or other overt causes of neurological symptoms.

b)   Some physicians also routinely order a CT Angiography ("CTA") of the head if there is no intracranial hemorrhage so that they can confirm whether the cause of the stroke is an occluded artery in the brain.

c)   Further to that, physicians at a few select hospitals with advanced imaging capabilities also routinely order a CT Perfusion ("CTP") study to measure the volume of the infarct (dead tissue) and the volume of penumbra (tissue that will die if occluded vessel is not opened).

78.     If the imaging tests show acute ischemic stroke, the attending physician may administer IV-tPA.  There are a number of important criteria that an ischemic stroke patient must meet in order to receive this "clot busting" therapy. For instance, there is a narrow (though widening) window of time in which tPA can be used effectively. Failure to recognize stroke and get to a hospital within that window is a primary obstacle to otherwise eligible patients receiving IV-tPA treatment. In addition, there must be no evidence of bleeding (hemorrhage) because IV-tPA   can  exacerbate  a  hemorrhagic  stroke. Consistent with that, patients taking blood thinners cannot receive tPA. Other

exclusion criteria include severely elevated blood pressure or blood sugar, recent surgery, low platelet count, and end-stage liver or kidney disorders.

79.     When administered intravenously (usually through a vein in the arm), tPA travels from the point of injection through the blood stream until it reaches the blockage. Significant amounts of tPA must be used because the drug becomes diluted in the blood stream as it travels to the site of blockage. For tPA to be effective, physicians must calculate the proper weight-based dose and ensure that it is infused intravenously for sixty (60) minutes.

80.     Some patients arrive at the hospital too late to qualify for IV- tPA, or they have some other contraindications that effectively prohibit the use of the drug. A new potential companion is an endovascular procedure involving the use of a mechanical device on the end of a catheter to physically pull out all or part of a clot.

**B.     Mechanical Thrombectomy Devices**

81.     If, in fact, a patient is contraindicated for IV-tPA, or if IV-tPA is ineffective for removing the blood clot, doctors may utilize an endovascular procedure called mechanical thrombectomy in which the doctor tries  to remove  the blood clot by sending a wired-caged device called a stent retriever to the site of the blocked blood vessel in the brain. To remove the clot, doctors thread a catheter through an artery in the groin up to the blocked artery in the brain. The stent opens and grabs the clot, allowing doctors to remove the stent

with the trapped clot. Special suction tubes may also be used. If utilized, the procedure should be done within six hours of acute stroke symptoms, and only after a patient receives IV-tPA (or IV-tPA is contraindicated). An illustration of how mechanical thrombectomy works is found below:



82.     The first mechanical thrombectomy device approved by the FDA is the MERCI Retriever. The MERCI Retriever obtained FDA clearance in August 2004 for re-canalization of cerebral arteries in acute stroke.

83.     Since that time, utilizing the 510(k) clearance process, other substantially similar medical devices came onto the market. For example, in September 2007, the FDA granted 510(k) clearance to the Penumbra System ("Penumbra"), which is a mechanical device designed to reduce clot burden in acute stroke due to large-vessel occlusive disease, similar to the Merci Retrieval System.

84.     Defendants created their own mechanical thrombectomy device: the Solitaire FR Revascularization Device.  The SWIFT (Solitaire FR with the

Intention for Thrombectomy) Study was a multi-center, IDE, randomized, prospectively controlled study comparing the performance of the Solitaire FR Revascularization Device with a commercially available Merci Retriever.

85.     On March 2, 2012, the FDA finished reviewing the 510(k) and determined the Solitaire FR device was substantially equivalent to the Merci Retriever based on the successful completion of non-clinical bench and animal testing, clinical testing, and similar principles of operation and indications for use.  The Solitaire's specific indication is:

> intended to restore blood flow by removing thrombus from a large intracranial vessel in patients experiencing ischemic stroke within 8 hours of symptom onset. Patients who are contraindicated for intravenous tissue plasminogen activator (IV t-PA) or who fail IV t-PA therapy are candidates for treatment. The device is intended for use in the neurovasculature such as the internal carotid artery, M1 and M2 segments of the middle cerebral artery, basilar, and the vertebral arteries.

86.     Competition for market share with the mechanical thrombectomy device increased in August 2012, when the Trevo Retriever device ("Trevo") received FDA 510(k) clearance with the indication to treat individuals with acute ischemic stroke due to large intracranial vessel occlusion who are ineligible for or fail intravenous tissue plasminogen activator.

87.     That same month, August 2012, just five months after Defendant received approval to market the Solitaire, Defendant began a new clinical trial: Solitaire With the Intention For Thrombectomy as PRIMary Endovascular Treatment ("SWIFT PRIME") Trial.

88.     The stated purpose of the SWIFT PRIME trial was to determine if patients experiencing an Acute Ischemic Stroke due to large vessel occlusion, treated with combined IV t-PA and Solitaire FR within 6 hours of symptom onset, have less stroke-related disability than those patients treated with IV t-PA alone.

89.     The primary outcome measure was a 90-day global disability assessed via the blinded evaluation of modified Rankin score (mRS).   The secondary outcome measures were: (1) death due to any cause at 90 days; (2) functional independence as defined by modified Rankin Scale (mRS) score $\leq 2$ at 90 days; and (3) change in NIH Stroke Scale score at $27 \pm 6$ hrs post randomization.

X.     **PARTICULARS OF DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS**

**A.   The FDA's Approval of the Solitaire Device was Fraudulently Induced:   Defendants Concealed Material Study Deficiencies in the SWIFT Trial**

90.     AS stated above, Defendants conducted the "SWIFT" trial comparing the performance of the Solitaire FR Revascularization Device with a commercially available Merci Retriever. Enrollment in the SWIFT trial occurred between February 24, 2010 and February 17, 2011.

91.     The purpose of SWIFT was to demonstrate substantial equivalence of the Solitaire with MERCI.  The primary efficacy endpoint of the study was

arterial recanalization of the occluded target vessel measured by "Thrombolysis in Myocardial Infarction (TIMI)" score of 2 or 3 following the use of the device. The safety endpoint of the study was the incidence of device-related and procedure related serious adverse events (SAEs). The study took place at sites throughout the United States, Europe and Canada and involved 200 subjects.

92.    Several third-party SWIFT study audits aptly describe the issues and violations of regulations that occurred when conducting the SWIFT trial.

93.    On September 23, 2011, Regulatory and Clinical Research Institute, Inc. ("RCRI"), conducted a SWIFT Study site audit to assess adherence to the study protocol and applicable regulations. The third party audit occurred at Overlook Hospital located at 99 Beauvoir Road, Summit New Jersey (Site #9), and was conducted August 23-24, 2011 by Mark Kay Sobcinski. The audit summary states that the site screened six candidates and enrolled three subjects; two of the subjects died prior to completing their 30-day follow-up visits and one was transferred and improperly terminated from the study before her 30-day follow-up visit. Therefore, no subjects completed the study at this site. Among others, the following issues were discovered during the audit:

- There were multiple errors on the IRB Renewal Form

- There is a lack of a clear paper trail documenting the issues of the wrong ICF signature, study suspensions, and IRB communications

- Study forms, such as the Delegation of Authority (DOA) Form, were signed very late/well into the study

- Signatures and initials on various forms including the DOA Form do not match and need to be confirmed

- There were three unreported serious adverse events ("SAE") that were found in a review of the medical records by the auditor

- Multiple protocol deviations need to be filed for missing SAE reporting deadlines

94.     RCRI also audited the master files of the sponsor, ev3, Inc., Neurovascular Division located at 9775 Toledo Way, Irvine, California 92618, related to the SWIFT study.  The audit report was submitted to Angie Lee and was dated September 26, 2011.  The audit summary stated that documentation of study activities was not always sufficient and corporate corrective and preventative action plans have been implemented regarding documentation practices and monitoring. Indeed, the audit report showed, among other things, several SAEs were not reported to the sponsor within 24 hours as required by the protocol; site training was not conducted in accordance with the protocol; adverse events were not appropriately classified; procedures for documenting deviations and addressing global deviations were not appropriately implemented; standard operating procedures were deficient; IRB correspondence files were incomplete; and no records were kept of the receipt, use or disposal of devices.

95.     An audit report dated September 26, 2011 of Intrinsic Imaging LLC, a radiology core lab responsible for evaluating angiography and CT/MRI images for the SWIFT study, was submitted to Stacey Pugh.   Among the significant areas of concern noted by the auditors were: the images came to the lab without the subject identifications numbers and there is potential for the image not being attributed to the correct subject; no study specific training was conducted by the sponsor; and documentation regarding personnel was lacking.

96.     RCRI also conducted SWIFT study site audits for compliance with relevant regulations at the following sites, and submitted audit reports on the following dates: University of Pittsburgh Medical Center on September 30, 2011; Beth Israel Hospital in New York on September 13, 2011; Capital Health in New Jersey on September 13, 2011; OhioHealth Research Institute (ORI) in Ohio dated September 1, 2011; Medical College of Wisconsin/Froedert Hospital dated August 25, 2011; Oregon Health & Science University (OHSU) dated August 22, 2011; Millard Fillmore, Gates Hospital in Buffalo, New York dated August 10, 2011; and MultiCare Research Institute in Tacoma, Washington dated July 25, 2011.

97.     These site audits described the following issues, among others, with the sites: major issues with reporting SAEs, adverse events and deaths, poor documentation, unreported protocol deviations, poor oversight by Principal

Investigators, lack of standard operating procedures and monitoring plans, and untrained personnel.

98.     In February 2012, a "Mock FDA Inspection of the SWIFT Study," was prepared for Covidien Neurovascular by Carl Anderson, a Regulatory Compliance Consultant to assess the sponsor's compliance with regulations in preparation for a possible FDA inspection. The consultant identified issues in the following areas: (1) the sponsor did not adequately document monitoring the progress of the investigation as evidenced by numerous monitoring visit reports in draft format; (2) the sponsor's Investigator's Agreement did not contain a provision requiring the investigator to supervise the testing of the device on all human subjects; and (3) the sponsor did not have procedures in place for a consistent trial master study.

99.     As shown in these audit findings, and presumably as a result of these audits, the Clinical Monitoring Plan (CMP), which describes monitoring procedures for clinical trials that ensures the trial is conducted, recorded, and reported in accordance with the protocol and regulatory requirements, was not finalized until September 27, 2011, more than three months after the last patient finished the study. Similarly, the Statistical Analysis Plan ("SAP"), which describes the statistical methods that will be utilized to gather and analyze data gathered throughout the clinical trial, was not finalized until November 11, 2011, months after the last patient completed the study and

three days before the Final Clinical Study Report was written and submitted to the FDA on November 14, 2011.

100.    Since these plans were the key to monitoring and minimizing bias by documenting the methods for dealing with protocol deviations, premature discontinuations, missing data and the ways in which anticipated analysis problems would be handled, waiting to finalize the plan until after the last patient completed the trial is not recommended and leads to faulty data and trials.

101.    In addition to the issues set forth in the above referenced audits, Relator conducted a random review of eight (8) patients enrolled in the SWIFT study and noted two major deficiencies. Specifically:

a.    Patient 07-001 was enrolled on December 16, 2010 and, according to the Case Report Form, was noted to be contraindicated to IV-tPA and was thus consented/randomized in the study.  However, the medical record dictated by the physician, stated "The question was whether to give him IV tPA. I told them that an 85-year old with a large stroke likely the IV tPA is not going to really help. I advised to give him a little fluid, 50mL with a total of 255 albumin and helicopter him to Southdale to get the interventional procedure." It is misleading to categorize this patient as "contraindicated" for IV-tPA for study reporting purposes, just because the physician felt that IV-tPA "is not going to really help."   The physician needs to follow the guidelines. Incidentally, the patient died on December 27, 2010.

b.    Patient 08-002 the records stated that the patient failed IV-tPA, however, nowhere in the medical records sent to Covidien did it mention the start time, the stop time, the dose, or whether the IV tPA ran for at least 61 minutes. There is also not a Medication Administration Record documenting the administration of IV tPA. Based on the available documentation, it cannot be verified whether the patient met the definition of 'IV tPA failure.'

102.    Relator is not aware of any corrective action plan put into place by

Defendants per the auditors' suggestion.  The issues presented in the SWIFT

trial caused materially deficient and faulty data to be submitted to the FDA in

conjunction with Defendants' 510(k).

**B.    Defendants' Illegally Marketed the Solitaire Device as a Stroke Treatment and Caused Claims to Be Submitted to the Government that were Not "Reasonable and Necessary"**

1.    The FDA Was Clear the Solitaire Should Not Be Marketed as a "Stroke Treatment"

103.    Defendants submitted the initial IDE application for the Solitaire

device on May 6, 2009.  The Defendants stated the Solitaire is:

designed for use in flow restoration of patients with ischemic stroke due to large intracranial vessel occlusion within 8 hours of symptom onset.  Patients who are ineligible for intravenous tissue plasminogen activator (IV-tPA) or who fail IV-tPA therapy are candidates for treatment.

104.    In a letter to the Defendants dated May 28, 2009, the FDA stated:

The currently cleared devices as well as your proposed indication for use state the device is used for revascularization of occluded intracranial vessels caused by ischemic stroke. FDA and the medical community are increasingly concerned that these devices have not been proven to be of benefit in the treatment of stroke. However, the devices are being used for the treatment of stroke. FDA strongly recommends that you include an effectiveness endpoint in your primary endpoint and that you power your study appropriately to create statistical assurance of such effect.

105.    After receiving the FDA's letter, in or around June 2009,

Defendants had internal discussions regarding the FDA's recommendation that

Defendants include an effectiveness endpoint and that the study create

statistical assurance of such effect.   Defendants discussed that adding an effectiveness endpoint to the primary endpoint would require a much larger study, and thus, significantly greater costs.  Defendants decided not to conduct this larger study.  In other words, although Defendants wanted to market the device as a "stroke treatment," they didn't want to spend the money to back it with science.

106.   On June 5, 2009, the FDA sent a letter to Defendants stating that it would be denying its IDE application for the Solitaire.  The FDA enumerated several deficiencies and asked Defendants to "delete statements that imply that the device is used to treat stroke." More specifically, the FDA stated:

You state that the purpose of your study is to "demonstrate the safety and effectiveness of the SOLITAIRE FR Revascularization Device (SOLITAIRE DEVICE) when used for treatment of subjects with acute ischemic stroke." However, in our May 28, 2009 conference call, you clarified your study is designed to establish the substantial equivalence of the Solitaire FR with a legally marketed device, and was not to establish safety and efficacy in the treatment of stroke.

107.   On July 7, 2009, Defendants provided a "Summary Response to FDA Questions and Requests," addressing this specific issue.   Defendants stated:

Per our May 28, 2009 conference call, the study design is to establish substantial equivalence of the Solitaire FR device with a legally marketed device.  The clinical protocol has been revised to reflect this change. . . The ICD ["Informed Consent Document"] currently states the purpose of this Study is to collect clinical data on the safety and efficacy of the SOLITAIRE DEVICE (investigational device), a new device to mechanically remove a

blood clot and restore blood flow to the brain, compared to a commercially available device (MERCI).

108.   In reliance upon, *inter alia*, Defendants' narrowing of their requested approval – namely, Defendants' agreement not to market the device as a stroke treatment, the FDA sent Defendants a "Conditional Approval Letter" on August 12, 2009.

109.   Notwithstanding the conditional approval, in this letter the FDA noted several deficiencies in the IDE application, and stated, again:

> The ICD should clearly state that the removal of a clot has not been demonstrated to improve stroke outcome. Although your ICD does not implicitly state that this is a stroke treatment, the Benefits section states that "the expected benefit is that the study device will improve the chance of survival and will lead to a reduction in permanent disability in patients with a stroke caused by a blood clot. Although not proven, the Solitaire device may result in flow restoration, in the brain thereby possibly improving the subject's outcome compared to the current approved devices." Please revise the Benefits section of your ICD to remove these statements. You may include expected benefits that are consistent with your indications for use and that address the potential risks to the subject. For example, you may state that the expected benefit is that the study device may improve blood flow. Additionally, you should inform patients that the procedure may have no effect or may worsen their condition.

110.   Defendants again sent a "Response to FDA Conditional Approval Letter" on September 25, 2009, stating "[t]he ICD has been revised to comply with the above recommendation."

111.   Defendants acknowledged that the Solitaire's "ability to improve patient outcomes has not yet been established . . . [and] [t]hese devices should

continue to be studied in randomnized controlled trials to determine efficacy of such treatment sin improving patient outcomes."

2.    <u>Defendants, All the While, Planned to Market the Solitaire to Physicians and Hospitals as a "Stroke Treatment"</u>

112.    Despite the fact that the FDA was adamant that the Solitaire NOT be marketed as a stroke treatment, Defendants induced the FDA by stating that they would not market the product as a "stroke treatment."  This was a lie.  In fact, Defendants had developed an elaborate marketing and sales platform specifically designed to do what Defendants told the FDA they would NOT do.

113.    Defendants' platform included implementing a sales & marketing plan based on a "hub and spoke model," which focuses on getting patients from outlying hospitals (spokes) to tertiary care hospitals (hubs) which had the means and ability to utilize the Solitaire. A visual of the hub and spoke "referral pattern" as referenced in a Covidien Sales & Marketing Power Point Presentation appears below: