114.    The Defendants' Sales & Marketing Department, including Scott Schuemann, the Covidien Senior Key Accounts Representative, developed the following multiple stage plan to begin targeting doctors and selling the Solitaire pursuant to the "hub and spoke" model:

Stage 1 or "Foundation": This stage involved market research, engaging the target physicians and engaging the "account."  Essentially, Defendants would use Acclaim data, which is data extracted from Medicare Inpatient Hospital SAP containing inpatient hospital claims for 100% of Medicare enrolls for that year, to identify the target "spoke" hospitals that were treating the most strokes, but did not have the ability to perform mechanical thrombectomies. The sales representatives would then use this data to show physicians/hospitals how much in revenue it would be able to make if it increased the amount of mechanical thrombectomies using the Solitaire. The sales representatives emphasized that, my transporting the patient from a "spoke" hospital" to a

"hub" hospital, the spoke hospital could bill for the IV-tPA and the transport and not have to admit the patient (~$10,000), and the "hub" hospital could also bill for the mechanical thrombectomy (~$20,000 to $30,000); this was termed the "ship and drip."

Stage 2 or "Implementation": This stage involved educating and engaging physicians and key hospital personnel, discuss clinical aspects of the Solitaire, engage administration, obtain signed "referral/transfer agreements," and educate "EMS," or emergency medical services which provides out of hospital acute medical care and transport. In educating EMS and "spoke" hospitals, sales representatives would impress upon them the importance to get the patient to the "hub" hospital where the Solitaire device could be used. In their marketing material used to court EMS and spoke hospitals, they endorsed mechanical thrombectomy as a stroke treatment and emphasized the limitations of the only approved stroke therapy, IV tPA. They heavily target EMS and "opportunistic" spoke hospitals to craft referral agreements to get patients to hospitals that use the Solitaire device.

Stage 3 or "Management": This stage involved reviewing the reimbursement guide with the hospital and staff, providing marketing collateral and media kits to hospitals, and assisting the hospital with continued marketing our "outreach," essentially to brand the Solitaire to the public as a "stroke treatment." Simultaneously, Covidien also used direct to consumer marketing that resulted in patients' families demanding that their family members be transferred to a hub hospital so they could get the mechanical thrombectomy.

115.   The "media kits" described in stage 3 of the sales & marketing plan described above, contained sample marketing materials for the hospital to use in order to attract stroke patients.  The marketing materials continually and egregiously referred to the Solitaire as a "stroke treatment." By way of example, the cover letter to the hospitals and physicians stated that "patients who were treated with the Solitaire FR device had higher rates of neurological function and reduced death from stroke."  The media kits contained the following marketing materials:

- The Solitaire Device Hospital Press Release, which was intended to be customized for the hospital to announce the product offering to the local media, stated in the title: "[INSERT HOSPITAL NAME] Announces New *Treatment* for Ischemic Stroke." (Emphasis Added.)

- The Solitaire Device Hospital Newsletter Article, which was intended for inclusion in the hospital publications to inform readers about the Solitaire, stated "[a] recent clinical study showed that patients *treated* with the Solitaire FR device had higher rates of neurological function and reduced death from stroke." (Emphasis Added.) It further stated: "We will be able to offer stroke patients a new option for *treatment* of this debilitating disease." (Emphasis Added.) Indeed, the title of the Press Release is: "[Hospital Name] announces Availability of a New *Treatment* for Ischemic Stroke." (Emphasis Added.)

- The Solitaire Fact Sheet, which was intended to provide key information about the Solitaire for local media, patients and physicians, stated "[i]n the SWIFT study, patients treated with the Solitaire FR device were less likely to have mental or motor impairment three months after stroke.... [and] had higher rates of neurological function and reduced death from stroke."

- The Solitaire brochure, which was intended to provide product information about the Solitaire for patients and physicians, stated the device would "revive neurological tissue."

- The Solitaire patient brochure stated: "Currently Two Methods Exist for Treating Acute Ischemic Stroke Patients" and discusses mechanical thrombectomy and the Solitaire, rather than IV-tPA.

116.   In terms of training its sales force, Covidien used a power point presentation that was made as a part of the Solitaire marketing plan. The presentation was entitled, "Solitaire FR for the *Treatment* of Acute Ischemic Stroke." The stated goal of the plan was to "drive increased patient flow into targeted Solitaire FR Interventional hospitals." The power point showed the amount of reimbursement a hospital could obtain from Medicare by

performing a mechanical thrombectomy using DRG-23 or DRG-24, which was $30,197 and $20,456 respectively.

117.    The sales & marketing department had weekly conference calls, where they constantly discussed how to physically steer patients to target accounts or hub hospitals. To incentivize sales representatives, Defendants gave them weekly goals or quotas.  For example, sales representatives were encouraged to "complete one spoke network proposal to a target hub to drive more mechanical thrombectomy procedures," and "[p]resent new ischemic stroke treatment options to a minimum of 6 EMS Directors."

3.   <u>Claims Submitted to the Government For the Solitaire Are Not "Reasonable and Necessary"</u>

118.    Medicare billing rules published by the Department of Health and Human Services state that program payment may not be made for medical devices which have not been "approved for marketing" by the FDA as such devices are not "reasonable and necessary." Current Procedural Terminology (CPT®), Professional Edition, American Medical Association (2006); SSA § 1862(a)(I)(A).

119.    Furthermore, the United States, through its Medicare programs, provide coverage and payment to "providers of services" for certain medical procedures or services performed using devices that have been "approved for marketing" by the FDA. However, under these programs no payment may be

---

**U.S. et al, ex rel DOE v. COVIDIEN PLC and EV3, INC.**

made for items and services which are not "reasonable and necessary." 42 U.S.C. § 13 y(a)(l).

120.   The Solitaire FDA-cleared indication states:

The SOLITAIRE™ Revascularization Device is designed to restore blood flow in patients experiencing ischemic stroke due to large intracranial vessel occlusion. The device is designed for use in the neurovasculature such as the internal carotid artery, M1 and M2 segments of the middle cerebral artery, basilar, and the vertebral arteries.

121.   The Solitaire is not approved for marketing by the FDA for any other procedure other than that which is to be performed as an adjunct service or procedure to IV-tPA.

122.   As detailed herein, Defendants knowingly misrepresented and continues to misrepresent, that its Solitaire was approved for marketing by the FDA to be a "stroke treatment," as opposed to being used in individuals with acute ischemic stroke due to large intracranial vessel occlusion who are ineligible for or fail intravenous tissue plasminogen activator.

123.   When a device is approved by the FDA for a specific indication for use, any new intended use requires submission of an additional approval to establish the safety and effectiveness of the device.

124.   There is not yet a study assessing the safety and efficacy of using Defendants' Solitaire as a stroke treatment.

125.   The American Heart Association/American Stroke Association does not recognize Defendants' Solitaire device as an effective form of stroke

treatment. Indeed, a comparison of the AHA guidelines and Defendants' marketing for the Solitaire is illustrative of differences in how to treat a stroke:

| Key Elements | American Heart/Stroke Association EMS Training | Covidien EMS Training |
|---|---|---|
| Promotes IV tPA bridging direct to mechanical thrombectomy? | No | Yes[1] |
| Promotes that IV tPA eligible patients receiving full IV tPA dose can get mechanical thrombectomy? | No | Yes[1] |
| Recommends transfer to nearest interventional center? | No[2] | Yes[3] |
| Talks about IV tPA limitations? | No | Yes[4] |
| Makes claims about mechanical thrombectomy "saving" patients? | No | Yes[5] |

126.    Similarly, the FDA has not approved the Solitaire to be used as a "stroke treatment."

127.    Moreover, CMS determined that the Solitaire is not a "covered procedure" for stroke treatment; in other words, it is not "reasonable and necessary" for stroke treatment.    Specifically, CMS National Coverage Determination Manual, at Section 20.2 entitled "Extracranial - Intracranial (EC-IC) Arterial Bypass Surgery"[14] specifically states:

Extracranial-Intracranial (EC-IC) arterial bypass surgery is not a covered procedure when it is performed as a treatment for ischemic cerebrovascular disease of the carotid or middle cerebral arteries which includes the treatment

---

[14] Available at: https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/ncd103c1_part1.pdf (last visited August 27, 2015).

or prevention of strokes. The premise that this procedure which bypasses narrowed arterial segments, improves the blood supply to the brain and reduces the risk of having a stroke has not been demonstrated to be any more effective than no surgical intervention. Accordingly, EC-IC arterial bypass surgery is not considered reasonable and necessary within the meaning of §1862(a)(1) of the Act when it is performed *as a treatment* for ischemic cerebrovascular disease of the carotid or middle cerebral arteries.

(Emphasis added).[15]

128.    Other health benefits providers explicitly deny coverage and reimbursement of the Solitaire for stroke treatment.

129.    In spite of this, the underlying purpose of the Defendants' entire sales and marketing of the Solitaire was/is to promote Solitaire for medically unnecessary uses by stating it was a "stroke treatment" and by demonstrating to hospitals and physicians how to secure reimbursement by using DRG codes for approved devices and procedures.

---

[15] In using the Solitaire, the physician accesses the femoral artery (this is extracranial), inserts a sheath into the femoral artery, and uses this point of origin to insert a variety of wires and catheters into the femoral artery that will eventually reach the brain (this is intracranial). The surgeon navigates said wires and catheters intra-arterially to the point of the narrowed arterial segments within the skull (this is intracranial). The surgeon advances the guidewire and microcatheter distal to the clot and the narrowed arterial segment (in other words, they bypass the narrowed arterial segment). Once proper placement is confirmed, the guidewire is removed and the Solitaire FR is then inserted under fluoroscopy and advanced inside the microcatheter until it is distal to the clot and the narrowed arterial segment (in other words, it bypasses the narrowed arterial segment). The Solitaire FR is then deployed by slightly pulling back the microcatheter. Once an improvement in blood supply to the brain is noted angiographically, the microcatheter and Solitaire FR are withdrawn as a unit under aspiration and removed from the femoral artery.
       The phrase "to restore blood flow" is tantamount to saying that blood supply to the brain is improved, which CMS said has not been demonstrated to be any more effective than no surgical intervention (i.e., not a stroke treatment). Moreover, CMS specifically referenced the carotid and middle cerebral arteries in their non-coverage decision.

130.    In fact, in sales presentations, Defendants state: "Physicians do not have a specific code for thrombectomy, and use a variety of generic codes when performing the procedure – thus, these procedures may be getting paid under the radar." Similarly, "MS-DRG 23 is used for several approved procedures, including ventriculostomy, brain incisions, and excision of brain lesions; thrombectomy comprises ~6% of procedures, and hence, may slip under the radar."

131.    Defendants' sales representatives promote the medically unnecessary use of the Solitaire by directly marketing and selling the Solitaire as a stroke treatment, while simultaneously teaching purchasers how to bill the procedure under a series of codes that have been exclusively designated for approved and reimbursable devices, but not for the Solitaire.

132.    By misinforming, misleading and misrepresenting to hospitals and physicians, Defendants caused the submission of medically unnecessary claims to Medicare.

**C.   Defendants Paid Kickbacks in the form of a "Swap" to Hospitals and Physicians In Exchange for Using Solitaire**

133.    Defendants' first method of illegally inducing the use of the Solitaire involved the so-called "Merci Swap".

134.    As stated above, Merci is a cleared medical device that is intended to restore blood flow in the neurovasculature by removing clots in patients experiencing ischemic stroke.

135.    When Covidien received clearance for the Solitaire in March 2012, Covidien Sales & Marketing representatives solicited approximately fifty (50) hospitals and their affiliated physicians throughout the United States to consent to a "Merci Swap" in order to get Solitaire in the hospitals.

136.    The "Merci swap" involved assigning a monetary value to each Merci device and swapping them out for discounted Solitaire devices so that the hospital would only have Solitaire devices to use.

137.    Covidien Sales Reps provided hospitals with a "Solitaire FR Revascularization Device Product Exchange Form" that had the following boiler plate language:

x number of Merci Retriever(s)® at x dollars per unit for a total dollar value of x dollars will be exchanged for Solitaire FR devices, discounted at x%, for a total cost per unit of x dollars. The total value of the transaction for the Solitaire FR devices is x dollars.

138.    The payment Defendants made to hospitals and physicians for the Merci in exchange for the hospitals and physicians utilizing the Solitaire is a kickback, which violates the Anti-Kickback Statute and False Claims Act.

**D.   Defendants' Used the SWIFT PRIME Trial To Sell the Solitaire Device**

139.    In November 2012, just five months after receiving FDA clearance, Defendants initiated the SWIFT PRIME clinical trial.  The alleged purpose of the trial was to determine if patients experiencing an acute ischemic stroke due to large vessel occlusion, treated with combined IV t-PA and Solitaire within 6 hours of symptom onset, have less stroke-related disability than those patients treated with IV t-PA alone.  Stated differently, the ostensible purpose of the trial was to obtain FDA approval for an indication that the Solitaire could be used as a "stroke treatment."

140.    The true purpose of the trial was to get money in the hands of doctors so that they would use the Solitaire as a stroke treatment.

141.    In the SWIFT PRIME trial, patients enrolled in the study who have received intravenous tissue plasminogen activator were randomized to either (1) continue with intravenous tissue plasminogen activator alone or (2) additionally proceed to medical thrombectomy using the Solitaire device within six-hours of symptom onset.

142.    After the study, statistical analysis would be conducted using simultaneous success criteria on the overall distribution of modified Rankin Scale (Rankin shift) and proportions of subjects achieving functional independence (mRS 0-2) between the two groups.

143.     The pressure to use SWIFT PRIME as a kickback increased in early 2013, when, competition in mechanical thrombectomy devices increased. Specifically, in April 2013, the Journal of NeuroInterventional Surgery (JNIS), a consortium of Stroke Centers from around the US, published an article regarding the "ADAPT" technique.  ADAPT involved a competitor's device – specifically, the Penumbra 5MAX or 5MAX ACE aspiration device.   The ADAPT technique involves placing Penumbra at the face of the clot and aspirating until the device becomes occlusive. The device is then gently withdrawn under continuous aspiration until the intact thrombus is removed.

144.     Penumbra then launched its 5MAX ACE device in July 2013.

145.     Defendants were concerned they were losing sales to Penumbra. In fact, at a National Sales Meeting in November 2013, the Vice President of Sales expressed concern about the high volume of Covidien customers using Penumbra and the ADAPT technique.

146.     Seeking to expand its market share and using the SWIFT PRIME trial as a kickback to get the Solitaire into hospitals, Defendants engaged their Sales & Marketing Department to become involved in day-to-day operations of the SWIFT PRIME clinical sites.

147.     The SWIFT PRIME internal organizational structure visually exemplifies this effort, as the Zone Managers or "ZM" were reporting to Becca Schour, the Senior Clinical Field Specialist and former sales representative,

and sales activities related to the SWIFT PRIME were communicated and intermingled with the clinical side of the study:



148.    By way of illustration,   the Vice President of Sales, Vascular Therapies, Neurovascular Sales, John Zehren, signed off on Clinical Trial Agreements, sales representatives:

- requested to go on SWIFT PRIME site visits
- constantly inquired to management about the status of SWIFT PRIME sites
- assisted SWIFT PRIME sites to "build their program"
- sought to keep accounts and sites being dropped from the SWIFT PRIME study.

149.    Covidien spent more time in selling and marketing the Solitaire than it did ensuring the integrity of the SWIFT PRIME trial; in fact, the sales

and marketing department had the opposite effect, it undermined the integrity of the SWIFT PRIME trial.

150.    On January 15, 2014, Pugh, Lee, Manish, and Yang, gave a presentation entitled "SWIFT PRIME MANAGEMENT REVIEW" in Irvine, California, to key players involved in the SWIFT PRIME trial, including, the Chief Medical Officer, the Medical Monitors, and the trial management team. Pugh presented on the "Stroke Franchise Overview." Pugh discussed the potential for market growth, stating that right now 9,891 mechanical thrombetomies were performed annually in the United States, however there are 98,906 potential mechanical thrombectomy eligible patients:



151.     Steve Fried, Covidien National Sales Manager for Stroke Therapy Systems, developed a bonus structure for sales representatives called "Management by Objectives" or "MBOs." This strategy assigned "zone managers" to oversee implementation of the sales strategies.   The bonus structure revolved around "optimizing . . . SWIFT PRIME protocol education at your target account assigned by Clinical Affairs Department."   Sales representatives were encouraged to "complete one spoke network proposal to a target hub to drive more mechanical thrombectomy procedures," and "[p]resent new ischemic stroke treatment options to a minimum of 6 EMS Directors." Under this bonus structure, sales representatives were financially compensated for each and every patient enrolled into SWIFT PRIME; which in itself, is a violation of the Anti-Kickback Statute.

152.     Given   the   incentive   structure,   sales   representatives   were understandably focused on marketing the Solitaire and not the integrity of the SWIFT PRIME study.   For example, in meetings and teleconferences with Pugh and Lee, sales representatives expressed that they were upset because they did not receive compensation if patients were randomized to the IV-tPA arm (and thus did not receive the Solitaire in the SWIFT PRIME trial).

153.     Becca Schour, a former Covidien Implementation Manager (Sales & Marketing) for Solitaire and then SWIFT PRIME Clinical Specialist, organized a wine & dine event on January 28, 2014 at Chima Brazilian

Steakhouse in Fort Lauderdale, Florida for over fifty (50) Tenet Health physicians & employees. Attendance was free for all participants, as was the exorbitant dinner and cocktails/wine.   It was sold as an Advanced Neuroscience Network Dinner; the purpose of the dinner was to discuss the importance of referring stroke patients to any of the 4 Comprehensive Stroke Centers in the Tenet system that could perform mechanical thrombectomy. The presentations lasted about an hour or so and Dr. Nils Mueller only spoke for about 5 minutes about current clinical trials he was participating in, including SWIFT PRIME.   Covidien's most successful sales person, Lisa Guillen, was at the dinner.

154.     In targeting potential SWIFT PRIME study sites, the focus was not on which sites could perform a solid, reliable study.  Instead, the focus was on increasing sales.  For example, the Covidien Sales and Marketing Department would determine which hospitals were using the "Penumbra and the ADAPT technique," and would then direct its nationwide sales force to  market the SWIFT PRIME trial to those hospitals, asking that they serve as trial sites.

155.     Defendants, specifically the Sales & Marketing Department, selected SWIFT PRIME Principal Investigators based on marketing importance and sales potential, rather than their experience and ability to conduct a clinical trial.  Indeed, Schuemann's, multiple stage marketing plan to target doctors and selling the Solitaire, included selecting SWIFT PRIME sites.

156.     By way of specific example, in March 2013, Angie Lee, a SWIFT and SWIFT PRIME Project Manager who reported to Stacey Pugh, the Vice President of Clinical & Medical Affairs, went to visit a potential investigator, Dr. Vidal, at Ochsner Health System in New Orleans, with Sales & Marketing representatives.   Dr. Vidal was targeted because a spreadsheet prepared by Sales & Marketing which set forth Dr. Vidal's mechanical thrombectomy numbers and device experience showed that Dr. Vidal had very little experience with the Solitaire, but performed high numbers of mechanical thrombectomies.   Despite his lack of experience with the Solitaire, Dr. Vidal was targeted by Sales & Marketing to be a principal investigator in the SWIFT TRIAL.   The Site Qualification Visit Report and documentation, further substantiates the fact that Dr. Vidal had very little experience with the Solitaire, no experienced research support staff, and that Dr. Vidal was a Principal Investigator for Penumbra trial. In fact, Dr. Vidal informed Lee that the Penumbra was the main device used by his hospital.   Nevertheless, Dr. Vidal was selected to participate in SWIFT PRIME on the condition that he did ten (10) cases under Covidien's Professional Affairs & Clinical Education ("PACE") program.   In other words, his hospital would have to purchase ten (10) Solitaire devices and use them under PACE before initiating the SWIFT PRIME trial.   Robert Gash, the Senior Program Manager for Acute Ischemic Stroke, stated that Dr. Vidal's selection as a Principal Investigator for SWIFT

PRIME appeared to be a sales tactic to get Defendants foot in the door at the hospital to increase Solitaire sales.

157.    Dr. Hanel, a physician at the Mayo Clinic in Jacksonville, Florida was also targeted as a Principal Investigator.  The Site Qualification Report completed after the site visit recommended that Dr. Hanel not be considered as a Principal Investigator.  However, the recommendation was revised after Pugh and Lee stated Dr. Hanel was "very important" from a marketing and sales perspective.  Dr. Hanel was also made a SWIFT PRIME Principal Investigator.

158.    Dr. Linfante, a physician at the Baptist Hospital of Miami, approached Defendants on October 26, 2013, and requested to be part of SWIFT PRIME. Lee informed Pugh that Dr. Linfante had approached Defendants before about participating, but he was not considered because he did not meet the minimum requirements. Pugh stated that Dr. Linfante did not have the research infrastructure or capabilities to participate in the trial, but he was important from a sales and marketing perspective. Dr. Linfante was subsequently selected to participate in SWIFT PRIME.

159.    Dr. Siddiqui at the Buffalo General Hospital in Buffalo, New York was also selected to participate in SWIFT PRIME.  Prior to his selection, Lee voiced concern over this selection given his abysmal performance in the SWIFT trial. Despite his past performance and Lee's concerns, Dr. Siddiqui was selected to participate in SWIFT PRIME because "upper management"

stated there were other factors to consider. As expected, significant issues began the moment the site began enrolling patients in SWIFT PRIME. Pugh and Lee made it clear that the site was untouchable because of their high sales volumes, Covidien's political and contractual arrangements with its physicians, and Covidien's obligatory financial support of its Jacobs Institute.[16]

160.     Dr. Vivek Reddy at the University of Pittsburgh Medical Center ("UPMC") was selected as a Principal Investigator for SWIFT PRIME. After significant issues were discovered during interim monitoring visits, monitors suggested that the site be placed on an enrollment hold. These issues and the suggestion of an enrollment hold was raised to upper management in November 2013, however, Pugh stated that while UPMC should be placed on an enrollment hold, it was not a feasible option because of Covidien's relationship with Dr. Tudor Jovin.[17]

---

[16] According to the official website, "The Jacobs Institute is a non-profit 501(c)(3) organization whose mission is to improve the treatment of vascular disease in Western New York and improve the local economy. JI will do this by driving next generation technologies in vascular medicine and related neurological diseases through collisions of clinicians, researchers, industry, and entrepreneurs." More details can be found at: http://www.jacobsinstitute.com/. Jacobs Institute staff includes Dr. Adnan Siddiqui, who is on Covidien's payroll.

[17] Dr. Jovin is an expert in interventional and non-interventional treatments for the entire spectrum of cerebrovascular disorders, including ischemic and hemorrhagic stroke, and is the leader of UPMC Stroke Institute, one of the highest volume centers in the country. He and Professor Anthony Davalos (Spain) served as principal investigators for the REVASCAT study, a randomized trial in Spain of endovascular therapy using the Solitaire device versus medical therapy for stroke due to large artery occlusion within 8 hours. REVASCAT began as a 5 million euro investigator initiated trial funded by Covidien. Robert Gash oversaw REVASCAT with Stacey Pugh and he said he is waiting for a visit from the FBI one day because he was quite uncomfortable with the amount of money for an investigator initiated trial. In fact, he said he had never witnessed anything quite like it in his 20 years of vast experience.

161.    Defendants' Sales & Marketing Department continued its plan to reward "good customers" through at least May 2014.  In an email dated February 13, 2014, Scott Schuemann noted, "I was able to arrange a meeting from Dr. Alhajeri with Stacey Pugh today to try and plead our case for their inclusion into SWIFT PRIME," and "I made sure Dr. Alhajeri was pulled from the long line and escorted into our symposium last night."

162.    On May 27, 2014, SWIFT PRIME Associate Project Manager, Cynthia Yang, responded to Bob Bushok and Scott Schuemann about their request to add another potential SWIFT PRIME site in Kentucky (Norton Hospital), because their "practice is changing (for the busier)," stating "[c]ould you please provide me with the contact info (site name, physician name, phone number and email) and we can reach out to the site and provide link to complete the Feasibility Questionnaire?"  Subsequently, in June 2014, Defendants visited to the hospitals in Kentucky for purposes of assessing their procedure volumes and research capabilities.  Bushok stated that if those Kentucky doctors were not selected for SWIFT PRIME, he would get them involved in STRATIS (STRATIS is Covidien's sham registry trial discussed below).

163.    Defendants paid additional kickbacks, in the form of appointments to committees and as independent contractors - to physicians, or principal investigators, participating in the SWIFT PRIME trial.

164.   For example, several of the investigators and their study coordinators participating in SWIFT PRIME were also invited to sit on the SWIFT PRIME Executive/Steering Committee or Study Coordinator Committee, including Drs. Tudor Jovin, Raul Nogueira, Adnan Siddiqui, Elad Levy, Katrina Barton, Monica Rodriguez, Erin Bonwit, and Kiva Schindler. Physicians are paid approximately $450 per hour and study coordinators are paid $75 per hour for work done in these positions. In order to receive payment, the physicians and study coordinators attended conference calls and meetings, but did very little work.

165.   Several SWIFT PRIME investigators also have Independent Consultant Agreements in place, including with Drs. Tudor Jovin, Raul Nogueira, Adnan Siddiqui, Elad Levy, Katrina Barton, Monica Rodriguez, Erin Bonwit, and Kiva Schindler, and are paid approximately $450 per hour to "serve as a technical consultant and to perform certain consulting services."

166.   Financial Disclosure Forms and IRB applications completed and submitted by the physicians who have these financial arrangements with Defendants do not disclose these relationships. Thus, the IRBs at these hospitals have not been made aware of such financial arrangements and patients have not been informed of the potential conflicts of interest.

167.   As a consequence of failing to disclose such financial conflicts of interest, study investigators have failed to obtain adequate informed consent

from patients participating in the SWIFT PRIME trial.  Accordingly, any trial data used in support of the Defendants marketing application that was generated from patients enrolled in the SWIFT PRIME trial without their adequate informed consent should be discounted because a cornerstone in all medical research is the notion of adequate informed consent.  As noted in the Declaration of Helsinki,[18] "In medical research involving competent human subjects, each potential subject must be adequately informed of the aims, methods, source of funding, *any possible conflicts of interest*, institutional affiliations of the researcher, the anticipated benefits and potential risks of the study and the discomfort it may entail, and any other relevant aspects of the study." (Emphasis Added.)

168.    Dr. Raul Nogueira is a site investigator for SWIFT PRIME at Emory University.  On July 3, 2012, Dr. Nogueira accepted Covidien's offer to enter into an Independent Consultant Agreement with Covidien to offer "core lab" services for a European Registry Trial entitled "STAR." Dr. Nogueira was selected because he was the number one consumer of mechanical thrombectomy devices.  However,  Dr. Nogueira – who was contracted by Covidien to provide core lab services – did not have any radiologists on staff to perform the services.

---

[18] Declaration of Helsinki is a set of ethical principles regarding human experimentation developed for the medical community by the World Medical Association (WMA). It is widely regarded as the cornerstone document on human research ethics.

169.    In the Independent Consultant Agreement, Dr. Nogueira is listed as the payee and payment went to his home at 1686 Montcliff Court, Decatur, GA 30033. Dr. Nogueira was having difficulty meeting timelines related to work associated with his Independent Consultant Agreement, so he enlisted the help of Dr. Liebeskind. Dr. Liebeskind did not have a separate Independent Consultant Agreement in place with Covidien, but Covidien consented to Dr. Liebeskind's assistance as long as Dr. Liebeskind signed a statement that essentially stated that he was being sub-contracted by Dr. Nogueira. When it was time to be paid for work performed as part of the Independent Consultant Agreement, Dr. Nogueira did not want to raise any "red flags" by having a check written to him alone in the amount of $80,800.00. He thus requested that a check was made out to him for $48,480.00 for his professional services, and a separate check in the amount of $33,320.00 be made payable to Dr. Liebeskind. In order to separate out the payments as desired above, Covidien determined that they would have to generate a separate Independent Consultant Agreement with Dr. Liebeskind. In an email from Dr. Liebeskind's dated March 29, 2013, Dr. Liebeskind mentions that the wire will be appropriated to UCLA's bank and then transferred to the Neurology account.

170.    The investment paid off. In 2013, Grady Memorial Hospital (part of Emory Health) purchased sixty-eight (68) Solitaire devices, valued at

approximately $476,000. In 2013, UCLA purchased sixty-two (62) Solitaire devices, valued at approximately $434,000.

171.   Despite this payment, Dr. Nogueira responded "No" to question 2.0 on the IRB application for SWIFT PRIME that asked:

Does the PI/Project Director, any individual listed as Senior/Key Personnel on the grant/contract, and/or any individual identified by the PI/Project Director as having responsibility and substantial independence in decision making for the design, conduct or reporting of this protocol have any of the following financial relationships with (a) the study sponsor; (b) a company whose products or services are used or studied in the research; and/or (c) the technology being studied? In calculating aggregate totals, the individual should include those financial interests of his/her spouse, same-sex domestic partner and/or dependent children as his/her own. The answer is YES if any of the following apply: Payments of $5,000 or more including salary; consulting fees; honoraria; and/or gifts received within the past 12 months or anticipated for the next 12 months (excluding salary, grant support, and other payments for services received from Emory University….

172.   Had Dr. Nogueira truthfully and accurately answered "Yes" to the above question on the IRB application, he would have been required, per Emory University's Policy for Investigators Holding a Financial Interest in Research, to undergo additional review by Emory's Conflict of Interest Committee to determine an appropriate management plan.  Components of such a plan could have included:

173.   Public disclosure of an Investigator's Significant Financial Interest;

• For research involving human subjects, disclosure of Investigator financial interest directly to participants;
• Appointment of an independent reviewer of data, manuscripts, and/or presentations;

---

U.S. et al, ex rel DOE v. COVIDIEN PLC and EV3, INC.

67

- Appointment of an independent monitor capable of taking measures to protect the design,
- conduct, and reporting of the research against bias resulting from an Investigator's financial interest;
- Modification of any Research proposal or plan;
- Change in personnel or personnel responsibilities, or disqualification of an Investigator from participating in all or a portion of any Research;
- Reduction or elimination by an Investigator of a financial interest; and/or
- Severance of any relationships that created the financial interest.

174.    Dr. Dileep Yavagal, a site investigator at the University of Miami Health System and Jackson Memorial Hospital has an Independent Consultant Agreement and a SWIFT PRIME Steering Committee Agreement with Defendants.   The Independent Consultant Agreement was entered into on October 31, 2012 and listed the payee as: University of Miami Miller School of Medicine, 1120 NW 14th Street, Suite 1356, Miami, FL 33136.  On October 10, 2013, the Independent Consultant Agreement was amended to list the payee as: Yavagal Strategic Solutions, LLC, a corporation formed by Dr. Yavagal on October 3, 2012.  Again, the investment paid off.  Later in 2013, the University of Miami Health System and Jackson Memorial Hospital purchased fifty-seven (57) Solitaire devices, valued at approximately $400,000.

175.    By contrast, Dr. Phil Meyers, a physician at Columbia Presbyterian, and well-known user of the Penumbra device, turned down Covidien's offers for him to participate in the SWIFT PRIME trial. Covidien Sales & Marketing targeted Columbia Presbyterian for SWIFT PRIME because of their business

potential and to take market share away from Penumbra. When Covidien's efforts to get its product into Columbia through Dr. Meyers failed, they tried to get the Solitaire device in the hospital by offering another Columbia physician, Dr. Stephan Mayer, the opportunity to be in SWIFT PRIME. In an email from Dr. Alexander (President of Society of Neurointerventional Surgery) to Brett Wall, Covidien President of World Wide Neurovascular, on July 12, 2013, Dr. Alexander shared Dr. Meyers' concerns about how Covidien bypassed him by going to another Columbia physician, Dr. Stephan Mayer, and offered him more money to participate in SWIFT PRIME. Dr. Meyers prevailed and Columbia Presbyterian did not end up participating in SWIFT PRIME. Upon information and belief, Columbia Presbyterian did not purchase any Solitaire devices in 2013 or 2014.

176.   Additionally, as suggested in the Clinical Trial Agreements, physicians/hospitals are receiving greater than fair market value for participating in the trial.  Specifically, payments by the Defendant are approximately $12,000 per IV-tPA patient enrolled and $16,000 per Solitaire patient enrolled, plus free devices worth approximately $7,000.  In contrast, in the SWIFT trial, physicians and hospitals were being paid only $8,000 for enrolling a patient to receive the Solitaire.

177.   It should also be noted that, upon information and belief, the majority of the work the investigators are performing is being billed to the

patient's insurance as part of routine stroke care. The same services and procedures (e.g. neurological assessments) that were billed to the patient's insurance were also being paid for as part of the study budget memorialized in the Clinical Trial Agreements (CTAs) between the Sponsor and the Institutions. The CTA lumped payments into broad categories, thus making it difficult to discern how Defendants' payments for items or services were allocated (routine care vs. study-specific tasks).

178.    The Vice President of Medical Affairs, Stacey Pugh, the SWIFT PRIME Project Manager, Angie Lee, and the Director of Reimbursements, Susan Kelly, stated during a teleconference on or about December 12, 2013 when discussing reimbursement challenges faced by Dr. Clark at Oregon Health & Science University (OHSU), that the justification for providing devices free of charge is to provide a "financial incentive" for the institutions to make Covidien competitive. This is the definition of a kickback.

**E.    Significant Issues with SWIFT PRIME**

179.    As stated above, SWIFT PRIME'S primary outcome measure was a 90-day global disability assessed via the blinded evaluation of modified Rankin score (mRS).  The secondary outcome measures: (1) death due to any cause at 90 days; (2) functional independence as defined by modified Rankin Scale (mRS) score ≤2 at 90 days; and (3) change in NIH Stroke Scale score at $27 \pm 6$ hrs post randomization.

180.    The Modified Rankin Scale (mRS) assesses disability in patients who have suffered a stroke and is compared over time to check for recovery and degree of continued disability. A score of 0 is no disability, 5 is disability requiring constant care for all needs; 6 is death.

181.    In the SWIFT PRIME study, trained blinded assessors interviewed and assigned a mRS to the patients enrolled in the study using Rankin Focused Assessments.  At the end of the study this data would be analyzed and used to show that the Solitaire improved, did not affect or decreased disabilities in enrollees.

182.    Primary efficacy outcomes (Rankin) recorded by blinded assessors at sites were questioned by a UCLA "consultant" *months after blinded assessors had already completed the Rankin Focused Assessments*. This led to sites changing (in Solitaire's favor) previously completed Rankin Focused Assessments.

183.    RAPID and ASPECTS (Alberta Stroke Program Early CT Score) were used to view the brain and determine the extent of a stroke.

184.    The RAPID software provides an interpretable real time view of brain perfusion, allowing physicians to determine lesion volumes for a wide variety of different thresholds.  When the SWIFT PRIME clinical trial was initiated, the RAPID software was utilized as part of the FDA approved protocol to qualify patients in the study.  If a patient entered the hospital with

signs/symptoms suggestive of an acute ischemic stroke, and the hospital was engaging in the SWIFT PRIME study, the physicians would order and obtain a non-contrast CT of the head ("NCCT"), a CT Angiography ("CTA") of the head, and a CT Perfusion ("CTP") study.  In order for CTP to be used with RAPID, scanners needed to be altered.  The alterations resulted in an increase in radiation and intravenous contrast. Once a patient was scanned, RAPID would process the images, send the results to the designated physicians and if the patient consented, he/she would be enrolled in the SWIFT PRIME study. The alteration in the scanner, which caused additional radiation and intravenous contrast, was not consented-to by the enrollees, and had led to elevated serum creatine and consequent reports of kidney injury.

185.    In November 2013, in order to increase enrollment in the study and to limit the potential treatment delays caused by the need for CT perfusion, Defendants revised the protocol and required physicians to use ASPECTS to qualify patients ("Revision F").  Defendants still provided hospitals with the expensive RAPID software, even though it was no longer a study requirement.

186.    ASPECTS is a non-contrast CT scan of the brain.  To determine trial eligibility, physicians (typically non-radiologists) review the CT scan to subjectively assess the amount of viable versus dead brain tissue the patient has remaining after a stroke.

187.    ASPECTS replaced RAPID's objective, quantifiable imaging software used to select patients who potentially stood to benefit the most (those with small core infarct and large penumbra) from mechanical thrombectomy, with a subjective, variable, and often times contradictory standard.

188.    The majority of SWIFT PRIME investigators vehemently opposed converting from RAPID to ASPECTS for patient selection because they felt it was highly subjective. Since the overwhelming majority of physicians performing mechanical thrombectomy were not trained or board certified in Diagnostic Radiology, they stated on numerous occasions that they were not comfortable or qualified to read a non-contrast head CT (NCCT) with the same precision that a trained Radiologist could.

189.    Additionally, when ASPECTS training was completed and rolled out, it was noted that large number of physicians (27 out of 41) had to take the ASPECTS test multiple times before receiving a passing grade, which indicated that either the test or training were unreliable or the criteria were simply too subjective to be reliable in a clinical trial.  Even then, Dr. Mayank Goyal, a trained Radiologist who conducted the ASPECTS training for SWIFT PRIME investigators, repeatedly illustrated how trained Radiologists often disagreed over the ASPECTS grading by large degrees.

190.    Thus understood, the decision to replace RAPID with ASPECTS in the SWIFT PRIME trial was designed to increase the volume of patients able

to be treated with the Solitaire by removing an objective method (RAPID) that had previously disqualified large numbers of patients from the study.  In the words of Dr. Nogueira, a world renowned interventional neurologist who treats hundreds of strokes each year: "I think the leadership for the trial has to rethink about the need for this.  ASPECTS are highly unreliable and Greg [Dr. Greg Albers, who designed RAPID] has proved that recently."

191.    The FDA requested a "poolability assessment," in October 2013 showing that the patients that previously qualified for the study by RAPID (approximately 70) would have also qualified based on ASPECTS.    In attempting to comply with the FDA's request, Defendants were concerned that ASPECTS could lead to a large percentage of ineligible patients being enrolled in the trial, which would undermine the submission to the FDA.  Cynthia Yang on or about January 30, 2014, that the core lab "mis-read" the ASPECTS and she was going to have Dr. Mayank Goyal (a member of the SWIFT PRIME Executive Committee) re-read the results.  In a face-to-face meeting with Stacey Pugh in San Diego, CA on or about February 10, 2014, this was revisited with Ms. Pugh and she stated that it was a matter of "core lab experts not reading ASPECTS how we wanted."

192.    In order to achieve positive trial results, Defendants and physicians conspired to perform additional procedures along with the Solitaire device to achieve positive patient outcomes.  More specifically, for patients receiving the

Solitaire, as opposed to the IV-tPA, physicians were advised, when needed, to perform angioplasties on patients to improve the patient's result.

193.    An angioplasty is a procedure that opens clogged arteries to prevent or treat stroke. Defendants understood that angioplasty or stenting during the mechanical thrombectomy would not be allowed because it would confound the primary endpoint (in fact, Defendants' own training materials for the SWIFT trial explained that angioplasty or stenting would confound the primary endpoint).   Despite this admonition, the SWIFT PRIME Executive and Steering Committee, at the meeting on February 11, 2014 in San Diego, California, discussed that because the revised protocol didn't specifically prohibit angioplasty, and since the FDA didn't catch this inadvertent omission in their review, investigators would be advised verbally that they could perform angioplasties concurrently with mechanical thrombectomies for subjects randomized into the Solitaire group.  The performance of additional procedures on patients receiving the Solitaire would skew data and result in a more favorable trial outcome.

194.    Defendants also skewed results by negatively effecting outcomes in the IV-tPA group and by hiding the fact that many patients did not get the correct, full does of IV-tPA.  On January 15, 2014, Covidien executives, SWIFT PRIME project managers, and Medical Monitors attended a "deep dive" meeting in Irvine, California to discuss SWIFT PRIME study challenges

and data.   Dr. Mohamed Amer, Covidien's Director of Patient & Product Safety, and Dr. Manejeh Yaqub, a SWIFT PRIME medical monitor, were "very concerned" about an imbalance in adverse events favoring the IV-tPA arm over the Solitaire arm.   Subsequent to this meeting, Dr. Yaqub, Angie Lee and Cynthia Yang messaged the medical monitors that they should look more closely at the IV-tPA patients so that more adverse events could be identified and any safety imbalance could be resolved in the Solitaire's favor.

195.   Not only did Defendants skew results by negatively affecting the outcome in the IV-tPA arm, they skewed results by positively effecting outcomes in the Solitaire arm.   Dr. Amer emphasized that "abnormal laboratory findings" in the Solitaire arm, which the protocol stated should be reported as adverse events, should not be reported as adverse events.   When questioned via email about the reporting these adverse events in the Solitaire arm, Dr. Amer responded "there are details here that will be shared . . . on the phone."

196.   There were a relatively high number of protocol deviations in the SWIFT TRIAL, including major deviations affecting subject eligibility as it related to inclusion/exclusion criteria.

197.   Defendants repeatedly provided instruction to the monitors that if the project management team determined, in its sole discretion, that a protocol deviation was not (or could not have been) known by the investigator or study

staff at the time of randomization, then said deviation would not be recorded in the Protocol Deviation section of the Case Report Forms, i.e., would be ignored.

198.    The study monitors, including, Soyoung Han, Jeffrey Faatz, Cathie Schneider, Ethan Weaver, Robin Solinsky, Emily Homan-Lyons, Kimberly Bielich-Whalen, Sherita Hall, Tuypeakus McKay, and Kim Ruszkiewicz, bristled under this rule since it was not based on industry practice, federal law, and  recognized international standards.

199.    At one time, approximately 40% of all enrolled patients had eligibility violations. By not properly reporting protocol deviations, particularly eligibility deviations, Defendants placed patients at increased risk for death and significant disability.  For example:

a)    Buffalo Subject #104001: At baseline, this patient was noted to have a 1.4 cm aneurysm of the distal cavernous left internal carotid artery at its junction with the left ophthalmic artery. Such an intracranial aneurysm is a contraindication for IV tPA (and for SWIFT PRIME enrollment) because of increased risk of bleeding, significant disability, or death. Nevertheless, Dr. Siddiqui's Endovascular Fellow, Dr. Mokin, made a conscious decision to enroll the patient in SWIFT PRIME despite this aneurysm. As a consequence, the patient was placed at great risk.

b)    Buffalo Subject #104007: Patient was a 46-year old male in his usual state of health when he developed left hemiparesis, left facial droop, dysarthria, and headache on August 24, 2013. Past medical history was unremarkable except positive for cocaine use. The patient was treated with IV-tPA despite having a known contraindication (platelet count < 100,000/mm$^3$) to IV-tPA, and the patient was enrolled into SWIFT PRIME by the Endovascular Fellow despite the low platelet count noted above (also a protocol violation for SWIFT PRIME). The patient was randomized to the Solitaire FR arm and he

underwent mechanical thrombectomy. CT imaging done approximately 24 hours later revealed new findings of a subarachnoid hemorrhage and an intraventricular hemorrhage, leading to malignant cerebral edema requiring an emergent decompressive hemi-craniectomy. The patient experienced blood loss during surgery and required transfusion with pack red blood cells. The patient required a revision to the decompressive hemi-craniectomy on post-op day three due to brain herniation, followed by additional packed red blood cells post-op. Due to the patient's poor prognosis and constellation of other comorbidities that developed post-operatively (*i.e.* sepsis, respiratory failure, etc.), the family decided to withdraw support and the patient expired on September 4, 2013.

c)    UPMC Subject #103011: Patient was consented on September 14, 2013 and randomized to the IV-tPA arm.  After randomizing the patient, the site discovered that the patient was not eligible for the study.  The study coordinator called the SWIFT PRIME hotline to see whether they could withdraw the patient or if they needed to leave them in the study as an "intent-to-treat." Based on the timing of the events, it appeared that the site staff was not happy with the subject's randomization assignment (i.e. IV tPA only) and preferred to take the patient to the cath lab for an interventional procedure. Angie Lee told the study coordinator that they could withdraw the patient from the study and treat them per standard of care.  The patient was subsequently taken to the cath lab but died after a guide wire perforated an artery during the procedure.

d)    Erlanger Subjects #106017, #10616, #106015, #106014, #106012, #106011, #106010, # 106009, #106008, #106007, #106006, #106005, #106004, #106003, #106002, and #106001: For all of these subjects, Defendants were unable to verify whether the correct and full IV-tPA dose was administered because the medical records were deficient and the hospital staff failed to appropriately document the administration of IV-tPA.  A review of the medical records, appears to show that several subjects did not get the full dose of IV tPA, which is required per protocol. However, Cathie Schneider falsified the trip report and noted that there were no deviations or issues.

**F.    STRATIS Registry Trial Was a Sham Trial to Sell Solitaire Devices**

200.    The  Systematic  Evaluation  of  Patients  Treated  With Neurothrombectomy Devices for Acute Ischemic Stroke (STRATIS) Registry

---

trial's stated purpose was to is to assess outcomes associated with the use of devices intended to restore blood flow in patients experiencing acute ischemic stroke.

201.   Defendants' Sales & Marketing department designed STRATIS after Solitaire sales fell in the second and third quarter of 2013.   Internal teleconferences and discussions with Defendant sales representatives indicated that Solitaire device sales were dropping because of Stryker's TREVO registry trial.   According to Covidien Zone Managers Scott Schuemann and Chad Mullen, physicians were converting business to TREVO because they were being paid additional monies by Stryker for participation in the TREVO registry trial to use the TREVO device.

202.   The STRATIS investigator selection began in early 2014 and the first patient was enrolled in August 2014.

203.   Investigators were told that they would have to pay for the Solitaire devices, but that they would be able to bill insurance for the mechanical thrombectomy and also receive a trial payment.

204.   Manish Gupta, the Covidien Director of Clinical Affairs, Neurovascular confirmed on May 2, 2014 that Covidien would soon be making a formal announcement about STRATIS.   Gupta stated that, STRATIS will evaluate 900-1000 patients across 60 hospitals, physicians will be paid $1000 for each patient they treat with the device; the data being collected for

STRATIS is minimal (he literally laughed when he said that the case report form used to collect data would only be 5 pages); STRATIS will evaluate systems of care, recanalization rates, and 90-day outcomes; Steven Fried from Sales & Marketing has been heading the project and will be making the formal announcement; and many SWIFT PRIME sites will be targeted.

205.    It appears that STRATIS was concocted as a way to pay physicians for using the Solitaire device.   In fact, Bob Buschok, Covidien's North Regional Sales Manager, requested that his accounts, namely Dr. Fessler, who performed mechanical thrombectomies at three different area hospitals, conduct STRATIS at multiple sites.  Bushock was attempting to use STRATIS, as a kickback, to get the Solitaire device in the door at additional hospitals to multiply sales.

## XI.  DEFENDANTS' FALSE CLAIMS ACT LIABILITY

**A.  Defendants' Caused the Submission of False Claims for the Solitaire and Related Procedures, that Were Not Reasonable And Necessary, to the Government**

206.    Defendants' knew that the Solitaire was approved specifically by the FDA to be performed adjunct to IV-tPA, the only FDA approved "stroke treatment."

207.    Despite this knowledge, Defendants' knowingly developed intricate marketing plans, and coached it sales representatives to market the Solitaire as

a "stroke treatment," and instructed hospitals and physicians to bill Medicare under DRG codes for the use of the Solitaire as a "stroke treatment."

208.    CMS's national coverage determination specifically stated that mechanical thrombectomy devices are not reimbursable or "reasonable and necessary" if used as a "treatment for ischemic cerebrovascular disease."

209.    Coverage under Medicare is limited to medical services that are "reasonable and necessary" for the diagnosis or treatment of illness or injury. *See* 42 U.S.C. §1395y(a)(1)(A) (defining scope of Medicare benefits). Although a physician may lawfully use a device off label, there is no mandate that Medicare cover services involving such off label uses. To the extent that a healthcare provider seeks reimbursement for a procedure that is ineligible for payment under a federal healthcare program, either because the program bars coverage for a particular off-label use of a device or because the program places other conditions on coverage that are not satisfied, the claim is false. Defendants knowingly and intentionally caused hospitals and physicians to submit such false claims.

210.    Services *related* to a non-covered device are, similarly, not covered by Medicare.  42 C.F.R. § 405.207 ("payment is not made for medical and hospital services that are related to the use of a device that is not covered because CMS determines that the device is not 'reasonable' and 'necessary' . . . or because it is excluded from coverage for other reasons").

211.    As a result, all claims submitted to the government for the Solitaire during the times relevant to this complaint were false.

212.    Alternatively, because of Defendants' GLP, and GCP violations and accordingly, because the Solitaire was not "approved" or "cleared" by the FDA, the devices are considered "adulterated" 21 U.S.C. § 351(h) and a because such devices are hazardous to patient health when used as directed in its labeling the device is "misbranded." FDCA § 502(j); 21 U.S.C. § 352(j).

213.    Similarly, medical devices that lack clearance or approval from the FDA are considered investigational by federal healthcare programs and are not "reasonable and necessary."   42 C.F.R. §411.15(o)(excluding Medicare coverage for "experimental or investigational devices").

214.    To the extent that a healthcare provider seeks reimbursement for a procedure that is ineligible for payment under a federal healthcare program, the claim is false. *See United States et al. ex rel. Colquitt v. Abbott Laboratories et al.*, Case No. 3-06-cv-1769, N.D. Tex., United States of America Statement of Interest on Defendants' Motion to Dismiss, p. 8., dated Oct. 1, 2010 (hereinafter referred to as "Abbott Statement of Interest").

**B.    Defendants' Caused the Submission of False Claims Through False Certifications to the Government**

215.    A false certification occurs when the government has conditioned payment of a claim upon the certification of compliance with, for example,

regulation or statute. The claimant submits a false or fraudulent claim within the meaning of the FCA when he or she falsely certifies compliance with that statute or regulation. These certifications can either be express or implied.

216.    Express false certification occurs when a provider expressly and specifically, certifies compliance with a required statute or regulation. Thus, if a provider submits a claim to the government and falsely certifies compliance with a statute or regulation, FCA liability will attach for failure to comply, regardless of whether the certification caused a loss to the government.

217.    When seeking government reimbursement for medical devices, providers fill out an enrollment application forms, submit Form CMS 1450s and submit annual cost reports. In each of these documents, the provider certifies that it is familiar with the laws and regulations, and that the services were provided in compliance with such laws and regulations, they billed Medicare for only reasonable and necessary medical services, they did not violate the Anti-Kickback Statute, and they did not make false statements or misrepresentations of material facts concerning requests for payments under Medicare.

218.    In submitting reimbursement for the Solitaire, providers participating in federally funded health insurance programs are certifying that the Solitaire meets governmental standards. By selling the Solitaire to providers participating in federally funded health insurance programs,

Defendants caused these providers to falsely certify that the Solitaire devices were reasonable and necessary, the providers did not make any false statements or misrepresentations of material fact, they have complied with the Anti-Kickback Statute, and the Solitaire devices complied with statutes and regulations, including the GLP and GCP regulations.

219.    An implied false certification theory occurs when a provider submits a false claim without expressly certifying compliance with a statute or regulation.  Liability is imposed on the premise of an implied responsibility, not a financial loss.

220.    Defendants are obligated to provide safe, reliable, and quality-tested devices, which perform to their specifications, to the Government. By delivering and receiving payments for the Solitaire, Defendants are impliedly certifying compliance with the implied terms of safety and reliability for the devices.

221.    In submitting reimbursement for the Solitaire, providers participating in federally funded health insurance programs are impliedly certifying that the equipment meets governmental standards for the device and is safe and reliable. By selling the Solitaire to providers participating in federally funded health insurance programs, Defendants caused these providers to falsely certify that the devices met governmental standards, were safe and

reliable and the devices complied with statutes and regulations, including the GLP and GCP regulations.

**COUNT I**
**Federal False Claims Act**
**31 U.S.C. §3729(a)(1)(A)**

222.     Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

223.     Defendants knowingly submitted and caused the submission of false or fraudulent claims for payment or approval for devices to officials of the United States Government in violation of 31 U.S.C. §3729(a)(1)(A).

224.     By virtue of the false or fraudulent claims that Defendants presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

**COUNT II**
**Federal False Claims Act**
**31 U.S.C. §3729(a)(1)(B)**

225.     Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

226.     Defendants knowingly caused to be made or used, false records or statements material to false or fraudulent claims to the United States Government.

227.     By virtue of the false or fraudulent claims that Defendants caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## REQUESTS FOR RELIEF

WHEREFORE, Relator prays for judgment against the Defendant as follows:

that Defendant cease and desist from violating 31 U.S.C. §3729 *et seq.*, and the counterpart provisions of the state statutes set forth above;

that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §3729;

that Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act, and the equivalent provisions of the state statutes set forth above;

that Relator be awarded all costs of this action, including attorneys' fees and expenses; and

///

///

///

that Relator recovers such other relief as the Court deems just and proper.

Dated:          November 2, 2015

SHANBERG, STAFFORD & BARTZ LLP

/s/ Shane C. Stafford
Shane C. Stafford
sstafford@ssbfirm.com
19200 Von Karman Avenue
Suite 400
Irvine, California 92612
Telephone:  (949) 622-5444
Facsimile:  (949) 622-5448

BERGER & MONTAGUE, P.C.
Shauna B. Itri
Daniel R. Miller
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
sitri@bm.net

1

2

## DEMAND FOR JURY TRIAL

3

    A jury trial is demanded in this case.

4

Dated:      November 2, 2015

5

                           SHANBERG, STAFFORD & BARTZ LLP

6

                           /s/ Shane C. Stafford

7

                           Shane C. Stafford

8

                           sstafford@ssbfirm.com

9

                           19200 Von Karman Avenue
Suite 400

10

                           Irvine, California 92612
Telephone:  (949) 622-5444

11

                           Facsimile:  (949) 622-5448

12

13

                           BERGER & MONTAGUE, P.C.
Shauna B. Itri

14

                           Daniel R. Miller

15

                           1622 Locust Street
Philadelphia, PA 19103

16

                           (215) 875-3000
sitri@bm.net

17

18

19

20

21

22

23

24

25

26

27

28

---

**U.S. et al, ex rel DOE v. COVIDIEN PLC and EV3, INC.**